

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



RECEIVED
SEP 05 2023
PRO SE OFFICE

| | | |
|---|---|---|
| STEPHEN T. MITCHELL, | | AMENDED |
| | Plaintiff, | COMPLAINT |
| -AGAINST- | | AND |
| | | JURY DEMAND |
| THE CITY OF NEW YORK, | | |
| | Defendants. | Docket: 23-cv-4466 |
| | | (LDH)(LB) |

Stephen T. Mitchell, as and for his complaint against the above named defendants, alleges as follows:

## INTRODUCTION

1. On June 24, 2013 Plaintiff, Stephen T. Mitchell, unfairly and unconstitutionally was convicted of larceny after a jury trial that took place in Kings County Supreme Court in Brooklyn, New York. Plaintiff was denied a fair trial in accord with the fundamental requirements of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution primarily because of the misconduct and mendacity of the Defendant municipality and its agents.

2. The Plaintiff was indicted in August 2010 upon New York Kings County Supreme Court Indictment 4743-2010. The trial for this indictment began in early June 2013. Acting New York State Supreme Court Justice William E. Garnett presided over the trial.

3. Prosecutors with the Kings County District Attorney's Office (KCDA) knowingly and repeatedly withheld exculpatory information and encouraged and made use of materially false evidence and testimony throughout the pre-

1

trial proceedings and trial in order to win and preserve a conviction in violation of the Plaintiff's rights pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution during the prosecution of New York Kings County Supreme Court Indictment 4743-2010 and its related post-trial motions and appeals. The aforesaid misconduct of the Defendants continues to this day.

4. Stephen T. Mitchell seeks redress for the aforesaid misconduct, mendacity, and deliberate indifference of the municipal defendant that caused him to spend several years in prison and suffer significant mental and physical injuries and illnesses as a result of a false and unconstitutionally procured conviction.

## NATURE OF THIS ACTION

5. This is an action to recover compensatory damages and an award of costs and attorneys' fees for violations of Stephen T. Mitchell's rights secured by 42 U.S.C. §§1983 and 1988 and by the United States Constitution including the Fifth, Sixth, and Fourteenth Amendments because of the Defendant municipality's continuing misconduct and deliberate indifference to withholding exculpatory evidence and the use of known false material evidence to prosecute the Plaintiff by the Kings County District Attorney's Office (KCDA).

6. The City Defendants encouraged and facilitated the knowing use of false material testimony by Michael Pesce, Assistant District Attorney Laura Neubauer, and Assistant District Attorney Patrick Cappock and others. Michael Pesce was a Justice of the Kings County Supreme Court during the time he violated the federal constitutional rights of Stephen T. Mitchell at the behest of the KCDA.

2

7. This lawsuit also seeks to hold Defendant City of New York liable for the KCDA and their agents, employees, and officials misconduct pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978). The KCDA and their agents, employees, and officials maintained unlawful policies, practices, and customs during Stephen T. Mitchell's investigation, arrest, pre-trial proceedings, trial, and post-conviction proceedings, including appeals. In executing these unlawful policies, practices, and customs the KCDA and its agents, employees, and officials engaged in a continuing practice to violate the constitutional rights of criminal suspects and defendants, including Stephen T. Mitchell.

8. In the Plaintiff's case, the unlawful policies, practices, and customs enabled Michael Pesce, as well as other members, servants, employees, and agents of the KCDA, to violate the Plaintiff's federal constitutional rights. The policy-making officials acting on behalf of the City of New York were deliberately indifferent to racially discriminatory and unlawful policies, practices, and customs. As a result, the City of New York is liable for Stephen T. Mitchell's injuries.

## THE PARTIES

9. The Plaintiff is Stephen T. Mitchell, an African-American former attorney who was licensed to practice law in the State of New York.

10. The Defendant is the City of New York.

11. Defendant City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the city and the state of New York, and having the powers and duties imposed by law thereon.

12. The Kings County District Attorney's Office (KCDA) is at all relevant times an agency of Defendant City of New York. At all times relevant to this action, Defendant City of New York, by its agents, servants, and employees was responsible for the operation, maintenance, and control of the KCDA, and the selection, training, supervision, and disciplining of prosecutors.

13. At all relevant times, the Kings County District Attorney (the "District Attorney"), including Charles Hynes, Esq., Kenneth Thompson, Esq., and Eric Gonzalez, Esq., was and is an elected officer of Kings County responsible for the KCDA, an agency funded by Defendant City of New York.

14. The KCDA and its authorized delegates at all relevant times had final authority, and constituted policymakers for the City of New York and for whom the City of New York is liable, with respect to the hiring, management, training, supervision, and discipline of personnel employed by or assigned to the KCDA.[1]

15. The District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

16. The State of New York has provided by statute that Defendant City of New York's constituent counties—including Kings County—and hence Defendant City of New York itself, is liable for torts committed by county officers and employees, such as the District Attorney and Kings County Assistant District Attorneys ("ADAs"), and other employees of the KCDA. *See* N.Y. County Law §§ 53, 941.

17. Laura Neubauer, Esq. and Patrick Cappock, Esq. were prosecuting attorneys for Kings County Supreme Court Indictment 4743-2010.

---

[1] See <u>Walker v. City of New York</u>, 974 F.2d 293, 301 (2d Cir. 1992).

18. A former New York State Supreme Court Justice, Michael Pesce, testified on behalf of the Kings County District Attorney's Office during the trial. Michael Pesce was the state's principal witness during the trial and at the time he testified he was a sitting Justice of the New York State Supreme Court.

19. Michael Pesce, on his own accord and at the behest, encouragement, and supervision of the KCDA, falsely testified regarding material issues dispositive to the outcome of the trial. The knowing false material testimony offered by a former Justice of the Kings County Supreme Court during the trial directly led to the unfair and unconstitutional conviction of the Plaintiff.

20. Michael Pesce's knowing false material testimony as well as other factors such as the misconduct of the KCDA prosecutors and their agents, employees, and officials who were involved with this case; the unlawful failure of the KCDA to supervise the aforesaid prosecutors and agents, employees, and officials of the KCDA or intervene to prevent their mendacious and unlawful misconduct; and the misconduct, policies, customs, and practices of the KCDA persistently led to violations of the constitutional rights of criminal suspects and defendants, including the Plaintiff, Stephen T. Mitchell.

## JURISDICTION AND VENUE

21. This action is brought under 42 U.S.C. §§1983 and 1988 in that Stephen T. Mitchell alleges that he was deprived under color of law of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because of the fabrication of evidence, specifically, the false statements of Michael Pesce and others before the grand jury and at trial; Stephen T. Mitchell's arrest and prosecution on the basis of known false material evidence; the suppression of Brady information; and related false and misleading statements made during pre-trial and trial motions and proceedings and post-conviction proceedings, including appeals.

22. This Court has original subject matter jurisdiction over Mr. Mitchell's federal law claims under 28 U.S.C. §§1331 and 1343, this being an action seeking redress for the violation of Mr. Mitchell's constitutional and civil rights.

23. Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. §1391 because Mr. Mitchell's claims arose in this District.

## JURY DEMAND

24. Stephen T. Mitchell hereby demands a trial by jury for all issues raised by this complaint.

## THE PROCEDURAL HISTORY OF THE CASE

25. The Plaintiff was indicted in August 2010.[2] He was arrested and arraigned in September 2010.[3] He pled not guilty at his arraignment and has maintained that he is not guilty throughout all judicial proceedings.

26. Pre-trial proceedings lasted nearly three years. Among the most prominent motions were the Plaintiff's omnibus motion in December 2010. The omnibus motion contained a general request and a specific request for Brady material.[1]

27. The pre-trial proceedings also included the successful effort by the People to move pursuant to New York Criminal Procedure Article 660 for the Conditional Examination of one of the People's principal grand jury witnesses, Minnie Simmons.[5]

---

[2] See Exhibit 1. **(All Exhibits listed and numbered for this Amended Complaint correspond to the Exhibits on file as a part of the docket for the original complaint. Please refer to the Exhibits docketed for the original complaint).**
[3] See Exhibit 23.
[4] See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Exhibit 20 at Affirmation pages 1, 4 and Demand to Produce at pages 8, 9.
[5] See Exhibits 17, 18.

28. The pre-trial proceedings also included unsuccessful efforts by the Plaintiff to re-open the conditional examination of Minnie Simmons and obtain her medical and psychiatric records prior to the re-opened conditional examination.[6]

29. The pre-trial proceedings include a motion In Limine to preclude Minnie Simmons as a witness at trial.[7]

30. The Plaintiff also propounded a motion, pursuant to People v. Singer and the Fourteenth Amendment to the United States Constitution, that sought to dismiss the case because of pre-indictment delay.[8]

31. The Plaintiff contended the state prosecutors violated his Fourteenth Amendment rights, in bad faith, by allowing Minnie Simmons memories of her decisions regarding her stewardship of the Guardianship and Estate of Charles Brown to fade in order to enhance the People's prospects of obtaining a conviction.[9]

32. In October 2012 the Plaintiff sought to challenge the unlawful and unconstitutional nature of the grand jury proceedings for this case by means of a Writ of Prohibition.

33. The Plaintiff alleged the indictment was procured by fraud because the People knowingly allowed false testimony regarding the mental capabilities of Minnie Simmons to be presented to the grand jurors.

---

[6] See Exhibits 28, 29, 30, 31, 32, 33, 34, 35.
[7] See Exhibits 36, 38, 40.
[8] See People v. Singer, 44 N.Y.2d 241, 253-255 (1978); see also United States v. Marion, 404 U.S. 307, 320, 324 (1971); United States v. Lovasco, 431 U.S. 783, 788-795 (1977); Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988); Exhibits 37, 39, 41.
[9] See Exhibits 37, 39, 41.

34. The Supreme Court of the State of New York Appellate Division: Second Department denied the writ application on November 28, 2012 after a review of both parties' briefs.[10]

35. The Court of Appeals of the State of New York denied leave for the Plaintiff's October 2012 writ application on February 19, 2013.[11]

36. The pre-trial hearings and the trial began by early June 2013. The Plaintiff was convicted after trial on June 24, 2013 based upon known false testimony elicited by the KCDA. Plaintiff was sentenced May 23, 2014 to an indeterminate term of imprisonment of four to twelve years. A Notice of Appeal timely was filed on June 9, 2014.

37. The Plaintiff was incarcerated immediately after he was convicted after trial. He was released from parole and the custody of New York State on June 17, 2020.

38. On November 18, 2020 the Supreme Court of the State of New York Appellate Division: Second Department denied the Plaintiff all relief he sought on appeal.[12]

39. On March 31, 2021 the Court of Appeals of the State of New York exhausted all of the Plaintiff's state court appeals for this case by refusing to grant leave to appeal.[13]

---

[10] See Exhibits 42, 43, 44, 45.
[11] See Exhibit 46.
[12] See Exhibit 26
[13] See Exhibit 27

## FACTUAL BACKGROUND OF THE CASE

### a. <u>The Charles Brown Guardianship.</u>

40. This case emerges from probate matters involving the Estate of Charles Brown. Although the indictment primarily concerns the Estate of Charles Brown the case also involves a guardianship set up for Mr. Brown while he was alive.

41. When he was alive Charles Brown was the owner of real property located at 302 St. James Place in Brooklyn, New York.[14] The aforesaid property became a part of the estate upon Mr. Brown's death.[15]

42. Charles Brown was declared mentally incapacitated by the year 1999.[16] His sister-in-law, Minnie Simmons, was appointed as the lawful guardian for Mr. Brown pursuant to New York Mental Hygiene Law Article 81 by August 2000.[17]

43. Minnie Simmons' appointment as lawful guardian meant that she was responsible for decisions concerning Mr. Brown's personal and financial affairs.[18]

44. Charles Brown passed away in June 2003.[19] The Article 81 guardianship established for Mr. Brown was extinguished with his passing and Minnie Simmons no longer could administer assets once owned by Charles Brown through the guardianship, as his guardian, after he died.[20]

---

[14] Trial Record at 40.

[15] See <u>Matter of Frank</u>, 283 N.Y. 106, 110 (1940); <u>Matter of Glener</u>, 202 A.D.2d 503, 504 (2 Dept. 1994); <u>Vellozzi v. Brady</u>, 267 A.D. 2d 695 (3rd Dept. 1999); see also <u>In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010)(Pesce, J.)</u>; see also Exhibit 4.

[16] Trial Record at 37

[17] Trial Record 37, 41- 42; see also Exhibits 2, 3.

[18] See New York State Mental Hygiene Law Article 81 (hereinafter MHL).

[19] Trial Record 39, 692

[20] See <u>Matter of Frank</u>, 283 N.Y. 106, 110 (1940); <u>Matter of Glener</u>, 202 A.D.2d 503, 504 (2 Dept. 1994); <u>Vellozzi v. Brady</u>, 267 A.D. 2d 695 (3rd Dept. 1999); see also <u>In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010)(Pesce, J.)</u>; see also Exhibit 4.

## b. The Charles Brown Estate.

45. Mr. Brown left a Last Will and Testament with his passing that named Minnie Simmons as the executor of his estate.[21] Minnie Simmons initiated the probate process to assume becoming the executor with the help of an attorney named Marshall Kaplan.[22]

46. Mr. Kaplan filed a probate petition with the Kings County Surrogate's Court in order to seek the appointment of Minnie Simmons as executor within a few months after Mr. Brown's passing.[23] Minnie Simmons was familiar with Mr. Kaplan because he assisted her with her responsibilities as guardian from 2001 until Mr. Brown's passing in June 2003.[24]

47. On November 6, 2003 the Kings County Surrogate's Court issued a decree granting probate that named Minnie Simmons the executrix of the Estate of Charles Brown.[25]

## c. Retention of the Plaintiff by the Brown Estate.

48. The Plaintiff was hired as an attorney to represent the Estate of Charles Brown by Minnie Simmons within a year of the December 2005 sale of Charles Brown Estate's real property.[26]

49. Minnie Simmons' daughter, Linda Simmons, discussed with her mother whether or not the Plaintiff should be hired and was present when Minnie Simmons signed the retainer.[27]The retainer designated that the Plaintiff

---

[21] Exhibit 5; see also Trial Record 692, 846.
[22] Exhibit 6; Trial Record 304-305.
[23] Exhibit 6; see also Trial Record 45, 133, 304-305, 367-368, 560.
[24] Id.
[25] Exhibits 5, 7.
[26] Trial Record 707-708.
[27] Id.

would be compensated for his work on a percentage basis with no money paid up front.[28]

50. The Plaintiff was hired to sell real property of the estate and pay estate creditors.[29] Minnie Simmons, as the executor for the Estate of Charles Brown, entered a contract to sell and sold 302 St. James Place on December 23, 2005.[30] The Plaintiff represented the estate as an attorney during the contract and sale transactions.[31]

51. The appellant subsequently was accused of stealing proceeds of the sale of this property.[32]

### d. Justice Michael Pesce and the Charles Brown Guardianship.

52. Justice Michael Pesce was the primary witness for the People's case during the trial.[33]

53. He was a Kings County Supreme Court Justice in June 2003 at the time of Mr. Brown's passing. Justice Pesce was the judge assigned to preside over the *Brown* guardianship. He was assigned the *Brown* guardianship in 2003, just prior to Mr. Brown's death.[34]

54. In November 2004 Justice Pesce issued an order directing Minnie Simmons, the guardian for Charles Brown, to file a final accounting for the *Brown* MHL Article 81 guardianship.[35]

---

[28] Trial Record 707-708.
[29] Trial Record 847-848.
[30] Trial Record 245, 255.
[31] Trial Record 257.
[32] Exhibit 1.
[33] Trial Record 611, 658, 900, 1115-1116; see also Exhibit 4; In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010 (Pesce, J.).
[34] Trial Record 556.
[35] Trial Record at 367, 564.

55. MHL §81.44(a)(4) governs the content of a final accounting. The guardian was required to file a statement under oath that reported the approximate value of guardianship property at the time of the incapacitated persons death with an approximate amount of the claims, debts, or liens against the guardianship property.[36]

56. Marshal Kaplan represented the *Brown* guardianship for several years prior to Mr. Brown's death and was the attorney for the guardianship in June 2003 when Mr. Brown passed away.[37]

57. Judge Pesce testified that Mr. Kaplan was a co-guardian acting on behalf of the guardianship because Minnie Simmons could not obtain a bond.[38]

58. Justice Pesce's testimony was not true and he and the state prosecutors knew it was not true when it was said. Mr. Kaplan never was a co-guardian for the *Brown* guardianship.[39]

59. Mr. Kaplan was the attorney for the guardian while Mr. Brown was alive and his role as the attorney for the guardianship meant he should have prepared a final accounting for the *Brown* guardianship. Although Mr. Kaplan prepared a preliminary accounting for the guardianship, he never completed a final accounting.[40]

60. The Plaintiff began to appear before Justice Pesce for the *Brown* guardianship as the attorney for Minnie Simmons after he was retained as the attorney for the estate.[41] The Plaintiff had no involvement with the *Brown* guardianship before the June 2003 death of Mr. Brown.[42]

---

[36] MHL §81.44(a)(4).
[37] Trial Record at 45, 304-306, 367-368, 560; see also Exhibit 6.
[38] Compare Trial Record 560 with Exhibit 3.
[39] Trial Record at 38; see also Exhibit 2.
[40] Trial Record at 305.
[41] Trial Record at 708.
[42] Trial Record at 692, 708.

61. In June 2013 Justice Pesce testified that he expected the Plaintiff to prepare a final accounting for the *Brown* guardianship that including information pertaining to the sale of real property owned by the *Brown* Estate.[43]

62. However, in correspondence signed by Justice Pesce in August 2008, Justice Pesce informed Charles Emma that issues pertaining to the sale of the 302 St. James Street property were in the jurisdiction of the Kings County Surrogate's court and that he would defer to that court's purview.[44]

63. Justice Pesce insisted during the trial that he was authorized to include the closing for the real property owned by the *Brown* Estate as a part his order for the guardianship accounting because the real property was sold through the guardianship.[45]

64. However, Justice Pesce knew, and the trial court and state prosecutors knew, in accord with Justice Pesce's own written decision and order and his August 2008 letter to Charles Emma, that the property was sold by means of the Estate of Charles Brown upon an order issued by the Kings County Surrogate's Court. Justice Pesce knew this when he falsely testified during the trial.[46]

65. The Plaintiff's efforts to file the accounting that Justice Pesce sought had several handicaps. First, the Plaintiff never was the attorney for the guardianship while Mr. Brown was alive.

66. The Plaintiff did not have personal knowledge of the value of the guardianship property at the time of Mr. Brown's passing and thus could not affirm what the value of the guardianship was when Mr. Brown died.[47]

---

[43] Trial Record at 563.
[44] See Exhibit 25; see also Exhibit 4 at 2.
[45] Id.
[46] Exhibit 4; In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010 (Pesce, J.); see also Exhibit 25; Trial Record at 611, 658, 900, 1115-1116.
[47] New York Mental Health Law (MHL) §81.44(a)(4).

67. Second, Mr. Kaplan was responsible for filing the final guardianship accounting because he was the attorney assisting Minnie Simmons at the time of Mr. Brown's death.[48]

68. Justice Pesce dismissively ignored the Plaintiff's efforts to point out that Mr. Kaplan was not fulfilling his responsibilities to account to the guardianship court on behalf of the *Brown* guardianship.[49]

69. On June 26, 2008 Justice Pesce concluded the Plaintiff took too long to provide an accounting and appointed Charles Emma, as guardian ad litem, to complete the final accounting for the *Brown* guardianship.[50] Justice Pesce testified that he appointed Mr. Emma because the Plaintiff was unresponsive to the court's repeated demands for the final accounting.[51]

70. Justice Pesce never required Mr. Kaplan to assist the Plaintiff with preparing an accounting for the guardianship.

71. The order appointing Mr. Emma guardian ad litem for the *Brown* guardianship was deeply flawed. The order issued by Justice Pesce on June 26, 2008 falsely claimed the Plaintiff was the MHL Article 81 guardian for Mr. Brown notwithstanding Justice Pesce knew he was not.[52]

72. Both Justice Pesce and Mr. Emma knew the Plaintiff was not the guardian for Charles Brown at the time the June 26, 2008 order was issued.[53]

---

[48] Trial Record at 305.
[49] Trial Record at 637.
[50] Trial Record at 575; see also Exhibit 8.
[51] Trial Record at 563-574.
[52] Exhibits 8, 9. 62.
[53] Trial Record at 335; Exhibits 7, 9.

73. The order issued on June 26, 2008 indicated that Mr. Emma was "directed to prepare and file a final accounting for Mr. Mitchell covering that period of time from the date of his appointment to the date of this Order..."[54]

74. The appellant never was appointed guardian for Mr. Brown so there was no date of appointment as a starting point.[55]

75. The order issued June 26, 2008 also directed a final accounting for the guardianship to include several years beyond the date of death for Mr. Brown.[56]

76. New York law did not extend Justice Pesce the jurisdictional authority to order a guardianship accounting that included transactions beyond the date of Mr. Brown's June 2003 passing.[57]

e. Charles Emma's involvement as guardian ad litem.

77. Charles Emma testified that when he was appointed guardian ad litem Justice Pesce charged him with locating the assets of the guardianship.[58] The court granted Mr. Emma subpoena power and he began his investigation of the guardianship by July 2008.[59]

78. Mr. Emma became aware early in his investigation that Minnie Simmons was appointed the MHL Article 81 Guardian for Mr. Brown.[60] He also learned that Minnie Simmons was the executor of the Estate of Charles Brown.[61]

---

[54] Exhibit 8.
[55] Exhibits 2, 9; Trial Record 335.
[56] See Exhibits 8, 9.
[57] See Matter of Frank, 283 N.Y. 106, 110 (1940); Matter of Glener, 202 A.D.2d 503, 504 (2 Dept. 1994); Vellozzi v. Brady, 267 A.D. 2d 695 (3rd Dept. 1999); see also In the Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010)(Pesce, J.); see also Exhibits 4, 25.
[58] Trial Record 34, 37.
[59] Trial Record 34, 37.
[60] Trial Record 38, 41-42
[61] Trial Record 38-39, 41-42

79. Although Justice Pesce testified that he expected that the assigned guardian ad litem, Charles Emma, would speak to Minnie Simmons because she was Mr. Brown's guardian, Mr. Emma never spoke with her during the course of his investigation.[62]

80. Charles Emma testified that he never spoke to Minnie Simmons in his entire life as of the June 2013 dates he testified at trial.[63]

81. Mr. Emma testified that he did not speak to Minnie Simmons during his investigation of her actions as a guardian because he knew counsel represented her.[64]

82. Mr. Emma claimed he deliberately chose not to seek a waiver of attorney-client privilege from Minnie Simmons in order to interview her as a part of his investigation.[65]

83. Mr. Emma falsely claimed that he conducted a forensic audit of the moneys expended by the accused.[66]

84. His testimony was not true. He never approached Minnie Simmons to discuss whether or not the monies spent from the estate proceeds were unauthorized or inappropriate.[67]

85. In June or July 2008 Mr. Emma was told by one of Minnie Simmons' daughters that Minnie Simmons was exhibiting signs of dementia.[68]

---

[62] Trial Record 279-280, 617-620.
[63] Trial Record at 280.
[64] Trial Record 293-295.
[65] Trial Record at 293-295.
[66] Trial Record at 295-296.
[67] Trial Record at 279-280, 299.
[68] Trial Record at 144, 166-167, 279-280, 285, 312.

86. Mr. Emma did not retain the name of the daughter who told him of Minnie Simmons' dementia and never provided the source of this information to the defense.[69]

87. While Mr. Emma was the guardian ad litem for Mr. Brown's guardianship he spoke to an attorney named Marshal Kaplan. Marshal Kaplan represented the *Brown* guardianship throughout most of the term of the guardianship.[70]

88. Mr. Emma testified that Marshal Kaplan fully cooperated with him and gave him his files.[71]

### f. Justice Pesce and Charles Emma's investigation.

89. Justice Pesce and Mr. Emma used a fraudulent June 26, 2009 guardianship order as a basis to issue a subpoena to seize copies of the appellant's banking and financial records from third parties purportedly to conduct an examination of the guardianship's financial transactions.[72]

90. Justice Pesce issued a subpoena based upon his fraudulent authority from a fraudulent June 26, 2009 guardianship order to obtain the Plaintiff's bank records in February 2009.[73]

91. The Plaintiff challenged the jurisdictional basis of Justice's Pesce's authority to issue the subpoena Mr. Emma sought to use to obtain the Plaintiff's banking records.[74]

---

[69] Compare Trial Record at 144, 166-167, 279-280, 312 with Exhibit 10.
[70] Trial Record at 45, 304, 306, 367-368, 560-561; see also Exhibit 6.
[71] Trial Record at 45.
[72] Trial Record at 136-137, 589-590; see Exhibits 8, 9.
[73] Trial Record at 136-137, 589-590, 646-647; see Exhibits 8, 9.
[74] Trial Record 136-137, 589-590, 646-647.

92. Justice Pesce overruled the Plaintiff's jurisdictional challenge and his chambers received the records on or about February 23, 2009.[75]

93. Mr. Emma examined the Plaintiff's fraudulently subpoenaed bank records obtained by the use of the fraudulent court order.[76]

94. Neither Justice Pesce nor the guardian ad litem, Mr. Emma, spoke with Minnie Simmons regarding the contents of the records seized or discussed with her whether or not expenditures that were made from the proceeds of the sale of the property were unauthorized or inappropriate.[77]

95. On or about March 9, 2009 Mr. Emma issued a report to Justice Pesce in his capacity as guardian ad litem. The report concluded the appellant might have converted the sale proceeds of the estate's real property.[78]

96. Mr. Emma made the conclusions of his March 9, 2009 report without meeting with and discussing the report with Minnie Simmons.[79]

97. Minnie Simmons had served as the guardian for Mr. Brown until June 2003 and was serving as the executor for the Estate of Charles Brown as of the time Mr. Emma prepared his report. Mr. Emma recommended that the Kings County District Attorney's Office investigate the matter in his March 2009 report.

98. In March 2009 Justice Pesce sought and acquired the involvement of the Kings County District Attorney.[80]

---

[75] Compare Trial Record 136-137, 589-590, 646-647, Exhibits 8, 9 with Exhibit 4.
[76] Trial Record 137.
[77] Trial Record at 279-280, 299, 640-641.
[78] Exhibit 11.
[79] Trial Record at 280.
[80] Trial Record at 640-641.

99. The state prosecutors began to investigate whether or not the Plaintiff stole the proceeds from the sale of 302 St. James Place, Brooklyn, New York with the assistance of Charles Emma by April 2009.[81]

100. Mr. Emma's work with state prosecutors for the preparation of the case for presentation to the grand jury and for trial was extensive.[82]

101. Linda Simmons was a witness during the grand jury presentation and at trial. She is Minnie Simmons' daughter. Linda Simmons was a New York City Police Detective during the investigation and prosecution of this case.[83]

102. On or about May 6, 2010 one of the Kings County prosecutor's investigators, Vincent Verlezza, interviewed Linda Simmons on behalf of the Kings County District Attorney's Office. The interview took place approximately two months before Linda Simmons testified in the grand jury.[84]

103. Vincent Verlezza wrote in May 2010 that Linda Simmons told him Minnie Simmons was in the early stages of Alzheimer's disease.[85]

104. Minnie Simmons did not testify in the grand jury. The state prosecutors offered a CPL §190.30(3) affidavit in lieu of her appearance before the grand jury that purportedly was signed by Minnie Simmons on June 10, 2010.[86]

105. Minnie Simmons later testified during a CPL Article 660 hearing on May 18, 2011 that the signature on the aforesaid CPL §190.30(3) affidavit was not hers.[87]

---

[81] Trial record at 513; see also Exhibit 10.
[82] Trial Record at 277-279; Exhibit 10.
[83] Trial Record at 687-688.
[84] Exhibit 12.
[85] Exhibit 12.
[86] Exhibit 13; see Exhibit 19; May 18, 2011 Conditional Examination of Minnie Simmons at page 33.
[87] See Exhibit 19; the Conditional Examination of Minnie Simmons at page 33.

106. On July 8, 2011 and August 4, 2011 Linda Simmons testified before the grand jury about Minnie Simmons' mental capabilities.

107. On July 8, 2011 Linda Simmons testified that her mother was "mentally alright."[88]

108. On August 4, 2011 Linda Simmons testified her mother was "mentally okay."[89]

109. Linda Simmons' grand jury testimony differed markedly from what she told Vincent Verlezza a few months before her grand jury testimony.[90]

110. The Plaintiff was indicted by the use of an investigative grand jury on or about August 13, 2010 for the charge of Grand Larceny in the Second Degree.[91]

111. The Plaintiff was arrested at his home in New Jersey on September 8, 2010.

   h. Pre-trial proceedings prior to the May 2011 Conditional Examination of Minnie Simmons.

112. The Plaintiff was arraigned by mid-September 2010. He was charged with one count of Grand Larceny in the Second Degree.

113. The state prosecutors promised the Plaintiff that the People would furnish impeachment material in their possession consistent with their obligations pursuant to Brady v. Maryland in writing as a part of an October 5, 2010 Voluntary Disclosure Form furnished to defense counsel at or near the arraignment.[92]

---

[88] Exhibit 14.
[89] Exhibit 15.
[90] Compare Exhibits 12, 14, 15.
[91] Exhibit 16.
[92] Exhibit 23.

114.  The state prosecutors did not provide the Plaintiff at or near his arraignment with notice of the existence of facts or information that could be considered exculpatory consistent with the holdings of <u>Brady v. Maryland</u> or its progeny.[93]

115.  For example, although the People were in possession of Vincent Verlezza's notes indicating reports that Minnie Simmons was suffering from Alzheimer's disease at the time they furnished a Voluntary Disclosure Form by October 2010, the state prosecutors did not furnish the aforesaid Vincent Verlezza notes to the defense until on or about November 22, 2011; approximately six months after the May 2011 conditional examination of Minnie Simmons and more than one year after they provided the Voluntary Disclosure Form.[94]

116.  Further, the People did not reveal Charles Emma's April 2009 knowledge of the family reports of Minnie Simmons' dementia until Mr. Emma's testimony during the June 2013 trial; notwithstanding their promise made as a part of the October 2010 Voluntary Disclosure Form.[95]

117.  In October 2010 the state prosecutors put forth a motion pursuant to Article 660 of the New York State Criminal Procedure Law for the conditional examination of Minnie Simmons.[96]

118.  Minnie Simmons was the executor of the Estate of Charles Brown at the time of the indictment. She was of an advanced age at the time of the indictment and the state prosecutors expressly claimed that they sought to preserve her testimony via a video recorded conditional examination because of her age and poor physical condition.[97]

---

[93] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); see also <u>Fuentes v. T. Griffin</u>, 829 F.3d 233 (2d Cir. 2016).
[94] Compare Exhibit 12 with Exhibits 23 and 24.
[95] Trial Record at 144, 166-167, 279-280, 285, 312; see Exhibit 23.
[96] Exhibit 17.
[97] Exhibit 17 at ¶¶7-11.

119. No mention was made of Charles Emma's knowledge of reports from Minnie Simmons' daughter that she was suffering from dementia in the People's application for a conditional examination.[98]

120. The defense did not oppose the People's Article 660 application and the motion was granted in May 2011.[99]The conditional examination took place May 18, 2011.[100]

121. The defense put forth motions for discovery and other forms of pre-trial applications by December 2010 and the People responded to those applications soon after they were received.[101]

122. One of the pre-trial applications made by the defense in a December 2010 omnibus motion was for exculpatory facts or information consistent with the People's obligation pursuant to Brady v. Maryland.

123. The Kings County Supreme Court first ordered the People to furnish the defense with impeachment facts or information consistent with the People's obligation pursuant to Brady v. Maryland on March 28, 2011; this order was made approximately two months before the conditional examination of Minnie Simmons.[102]

     i.   The May 18, 2011 Conditional Examination of Minnie Simmons.

124. The conditional examination of Minnie Simmons took place on May 18, 2011.

---

[98] Trial Record at 144, 166-167, 279-280.
[99] Exhibit 18.
[100] See Exhibit 19.
[101] See Exhibits 20, 21.
[102] See Exhibit 22.

125. Minnie Simmons had considerable difficulty recalling facts and circumstances regarding the Estate of Charles Brown during her conditional examination.[103]She testified that she was going senile.[104]

126. The state prosecutors, through their investigative agent Charles Emma, were aware by April 2009 that there were reports from her family members that Minnie Simmons was suffering from dementia.[105]

127. The People sought to preserve the testimony of Minnie Simmons by means of a video-taped conditional examination because the state prosecutors considered her a potentially important witness whose testimony might not be available for trial because of her advanced age and physical condition.[106]

128. The state prosecutors because of their obligations pursuant to Brady v. Maryland, the promise made by the state's Voluntary Disclosure Form served in October 2010, and a March 2011 order issued by the Kings County Supreme Court insisting the People comply with their Brady obligations were required to provide the Plaintiff with Charles Emma's knowledge of reports of Minnie Simmons dementia from her family members and Mr. Verlezza's notes so the defense had access to this material prior to the May 2011 conditional examination.[107]

129. The People violated their obligations pursuant to Brady v. Maryland because the state did not provide the exculpatory or impeachment information prior to the conditional examination and Brady required the state prosecutors in this

---

[103] See Exhibit 19: the Conditional Examination of Minnie Simmons (May 18, 2011 at page 8, 17, 21-24, 28-32, 33, 34-36).
[104] Id. at 24.
[105] Trial Record at 144, 166, 279-280.
[106] Exhibit 17.
[107] Brady v. Maryland, 363 U.S. 83, 87 (1963); see also Fuentes v. T. Griffin, 829 F.3d 233, 247-253 (2d Cir. 2016); see Exhibits 22, 23,

case to disclose material exculpatory evidence early enough so that the defense could make use of exculpatory or impeachment information.[108]

130. Notably, Minnie Simmons testified during the conditional examination that she did not sign a CPL §190.30(3) affidavit regarding the permission and authority component of the larceny charge.[109]

131. The state prosecutor did not correct Minnie Simmons' testimony stating she did not sign the CPL §190.30(3) affidavit the People used as a material component of their presentation to the grand jury.[110]

j. Post-conditional examination efforts by the defense to obtain the medical and psychiatric records of Minnie Simmons.

132. The People did not want the Plaintiff and his counsel to know there were reports from her daughter that Minnie Simmons was suffering from Alzheimer's disease or dementia prior to the May 2011 conditional examination or the June 2013 trial.

133. The People repeatedly withheld information known by the state prosecutors and their agents that informed them that Minnie Simmons was suffering from Alzheimer's disease or dementia prior to, during, and after her May 2011 conditional examination.

134. The Plaintiff was unable to move for relief based upon information received during the May 2011 conditional examination until September 2011. One reason was the Plaintiff was not able to afford a copy of the conditional examination transcripts until August 2011.

---

[108] Brady v. Maryland, 363 U.S. 83, 87 (1963); see also Fuentes v. T. Griffin, 829 F.3d 233, 247-253 (2d Cir. 2016); Leka v. Portuondo, 257 F.2d 89, 99-103 (2d Cir. 2001); St. Germain v. United States, U.S. Dist. LEXIS 9784 (S.D.N.Y. 2004); United States v. Cobb, 271 F.Supp. 159, 163 (S.D.N.Y. 1967).
[109] See Exhibit 19; the Conditional Examination of Minnie Simmons (May 18, 2011 at page 33).
[110] Id. at page 33; see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

135. On September 18, 2011 the Plaintiff, independent of counsel, moved to dismiss the indictment pursuant to CPL §210.20 and CPL §210.35(5). The Plaintiff's motion of September 18, 2011 sought to renew his application for relief pursuant to the aforesaid statutes because of new information unavailable to the defense prior to the May 2011 conditional examination.

136. The September 2011 motion sought the dismissal of the indictment because Minnie Simmons testified during the conditional examination that material evidence presented to the grand jury was a fraud and stood uncorrected by the state prosecutors before the grand jurors voted for an indictment.[111]

137. The Plaintiff sought dismissal of the indictment because Minnie Simmons testified during the conditional examination that she did not sign a CPL §190.30(3) affidavit the People presented to the grand jury to obtain the indictment.[112]

138. The CPL §190.30(3) affidavit purportedly signed by Minnie Simmons was material to the grand jury presentation. Minnie Simmons did not testify in the grand jury. The aforesaid CPL §190.30(3) affidavit was presented to the grand jurors in lieu of Minnie Simmons' testimony in order to support the permission and authority component of the charge.

139. The Plaintiff sought to dismiss the indictment in the September 18, 2011 motion because Minnie Simmons testified that she did not sign the CPL §190.30(3) affidavit and, thus, a forged material document was presented by the People during the grand jury proceedings without correction.[113]

---

[111] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).
[112] See Exhibit 19: The May 18, 2011 Conditional Examination at 33; see also Exhibit 13.
[113] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

140. Pursuant to the September 18, 2011 motion the Plaintiff also sought to preclude Minnie Simmons' testimony before the grand jury or any hearing or trial pertaining to the indictment.

141. The Plaintiff contended in the September 2011 motion that the People falsely and knowingly presented evidence to the grand jury that Minnie Simmons was mentally competent to provide evidence to the grand jurors when they knew she was not.

142. Linda Simmons, Minnie Simmons' daughter, testified that her mother was "mentally alright" on two separate occasions before the grand jury notwithstanding the fact that she told the prosecutors' investigator, Vincent Verlezza, six months before her grand jury testimony that her mother was in the beginning stages of Alzheimer's disease.[114]

143. The People also knew as of April 2009 through Charles Emma that Minnie Simmons' daughter told him of her suffering from dementia.[115]

144. The Plaintiff moved in the September 2011 motion to preclude Minnie Simmons testimony before the grand jury or to grant disclosure of her pertinent medical and psychiatric records.

145. The court refused to consider the September 2011 defense motion prepared by the Plaintiff because it was not adopted by his counsel. The Plaintiff relieved counsel upon her refusal to present the September 2011 motion and new counsel was assigned.

---

[114] Compare Exhibit 12 at page 2 (bottom) with Exhibits 14, 15.
[115] Trial Record at 144, 166-167, 279-280, 312.

146. The Plaintiff's new counsel put forth a December 2011 motion, in part pursuant to Brady v. Maryland, that sought medical and psychiatric records for Minnie Simmons.[116]

147. The December 2011 motion argued that the Plaintiff was entitled to the medical and psychiatric records as a means of effective cross-examination because the aforesaid materials may have bearing upon the credibility of Minnie Simmons and her capability to perceive, remember, and accurately recall events.[117]

148. The aforesaid motion argued that Minnie Simmons conceded that she was going senile and provided numerous instances where she could not remember material facts and circumstances pertinent to the case.[118]

149. The People responded by providing a false affirmation in support of their opposition to the December 2011 motion.

150. On or about January 12, 2012 the state prosecutors responded to the Plaintiff's December 2011 motion's request for information pursuant to Brady: "[t]he People are aware of their continuing obligations pursuant to Brady v. Maryland, 363 US 83 (1963), and are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Minnie Simmons' testimony."[119]

151. The aforesaid material affirmation put forth by the People to oppose the December 2011 defense motion was false. The state prosecutors knew their affirmation concerned a material issue of the case and was false when it was

---

[116] See Exhibit 28; see also Brady v. Maryland, 363 U.S. 83, 87 (1963); see also People v. Baranek, 287 A.D.2d 74, 78-81 (2 Dept. 2001).
[117] Id.; see also People v. Rensing, 14 N.Y.2d 210, 212-214 (1964).
[118] See Exhibit 28; see also Exhibit 19 at page 23-24; see also People v. Gissendanner, 48 N.Y.2d 543, 550 (1979); see also People v. Knowell, 127 A.D.2d 794, 795 (2 Dept. 1987).
[119] See Exhibit 29 at ¶7.

made. The People never made an effort to correct this false material affirmation prior to or during the trial and appeal of this matter.[120]

152. On or about January 2012 the state prosecutors were in possession of their employee, Vincent Verlezza's, May 2010 notes of Linda Simmons' reports of her mother's Alzheimer's disease. These notes were not furnished to the defense until several months after the May 2011 conditional examination.[121]

153. The People knew, pursuant to Vincent Verlezza's May 2010 notes, about reports from Linda Simmons of her mother's Alzheimer's disease before their January 2012 affirmation.[122]

154. The People also knew by 2009 from Charles Emma, their investigative agent, that one of Minnie Simmons' daughters reported that their mother was suffering from dementia.[123]

155. When the People affirmed in January 2012 that they, "are unaware of any exculpatory material, specifically any material relating to a psychiatric or psychological condition which would bear on the competency of Minnie Simmons' testimony," they were lying and trying to conceal material facts that would have resulted in the likely disclosure of the records sought.[124]

156. The defense filed a reply to the People's January 2012 response on or about February 6, 2012. The reply affirmation highlighted Vincent Verlezza's May 2010 notes regarding Linda Simmons' discussion of her mother's Alzheimer's disease.[125]

---

[120] Napue v. Illinois, 360 U.S. 264, 269-272 (1959); United States v. Agurs, 427 U.S. 97, 103-106 (1976).
[121] See Exhibits 12, 24.
[122] See Exhibit 12.
[123] Trial Record at 144, 166-167, 279-280.
[124] See California v. Trombetta, 467 U.S. 479, 485 (1984); Kyles v. Whitley, 514 U.S. 419, 435 (1995); compare Exhibit 12 and Trial Record at 144, 166-167, 279-280 with Exhibit 29 at ¶7.
[125] See Exhibit 30.

157. On or about February 10, 2012 the Kings County Supreme Court issued an order determining the motion practice initiated by the defense concerning the production of Minnie Simmons medical and psychiatric records.[126]

158. Notwithstanding their obligations pursuant to Brady v. Maryland and Napue v. Illinois the state prosecutors did not furnish to the court or the defense information within the People's pre-trial possession pertaining to Charles Emma's knowledge of the reports by Minnie Simmons' daughter of her mother's dementia until during the June 2013 trial.[127]

159. Notwithstanding the fact that the People had access to Mr. Emma's information regarding Minnie Simmons' dementia by April 2009 the People made no effort to provide Mr. Emma's information regarding the reports of Minnie Simmons' dementia to the court while the February 10, 2012 and May 1, 2012 decisions were being considered or try to correct the record prior to Charles Emma's June 2013 testimony.[128]

160. The Kings County Supreme Court opens its February 10, 2012 decision and order expressing the court's concern as to why the defense waited seven months after the conditional examination to seek relief pursuant to Brady.

161. The court ignored its decision to refuse to consider the defendant's September 18, 2011 effort to address the People's Brady failures after the May 2011 conditional examination. The defendant's proposed motion sought Brady relief soon after the transcript for the conditional examination became available to him.[129]

---

[126] See Exhibit 31.
[127] See Brady v. Maryland, 363 U.S. 83, 87 (1963); Napue v. Illinois, 360 U.S. 264, 269-272 (1959); United States v. Agurs, 427 U.S. 97, 103-106 (1976); California v. Trombetta, 467 U.S. 479, 485 (1984).
[128] Id.; see also Exhibits 31, 32, 33, 34, 35.
[129] The September 18, 2011 motion proposed by the defendant raised the People's Brady failures prior to the conditional examination. The court did not accept the motion because it was not adopted by his counsel.

162.   The court's order of February 10, 2012 essentially questioned the utility of the defense request for Minnie Simmons' medical records seven months after the conditional examination.

163.   The defense was entitled to the medical and psychiatric records and a renewed conditional examination because the People withheld from the accused a full and fair opportunity to cross-examine the witness bearing upon her ability to accurately and reliably recall facts and circumstances pertinent to the case.[130]

164.   A medical or psychiatric report or an expert who had the opportunity to review her records may have determined that there was no circumstance that a jury could rely upon her testimony.

165.   The People used written testimony pursuant to CPL §190.30(3), relied upon by the grand jurors, to indict the Plaintiff. A full and fair review of her medical records and/or an expert opinion may have allowed the defense to challenge the grand jury presentation of the fraudulent CPL §190.30(3) affidavit before the Kings County Supreme Court.[131]

166.   The defense raised both the prospect that the People impeded the Plaintiff's opportunity to engage in a complete cross-examination of the witness during the conditional examination and was denied a state and federally constitutional fair grand jury presentation by the introduction of a CPL §190.30(3) affidavit by an incompetent or a person who testified under oath they did not sign a material document.[132]

---

[130] Fuentes v. T. Griffin, 829 F.3d 233, 245-253 (2d Cir. 2016).
[131] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); Crane v. Kentucky, 476 U.S. 683, 690 (1986); Napue v. Illinois, 360 U.S. 364, 269-272 (1959).
[132] Crane v. Kentucky, 476 U.S. 683, 690 (1986).

167. The court's decision and order of February 10, 2012 ignored that these issues were raised as a part of the initial <u>Brady</u> motions post-December 2011 and the Plaintiff's motion to reargue filed in March 2012.[133]

168. The court's order of February 10, 2012 wrongly determined that the defendant's omnibus motion did not make a specific or general request for <u>Brady</u> material.[134]

169. The order of February 10, 2012 directed the state prosecutors to furnish the court with the medical and psychiatric records of Minnie Simmons for an *in camera* inspection.[135]

170. The People furnished the court with the medical and psychiatric records of Minnie Simmons for an *in camera* inspection some time before the court's May 1, 2012 decision refusing to provide the defense access to the aforesaid records.[136]

171. The defendant filed a motion, with a supporting affidavit, asking the court to reconsider its February 10, 2012 decision on or about March 9, 2012.[137]

172. The re-argument request noted that the court overlooked and failed to address the consequences of the People's failure to meet their obligations pursuant to <u>Brady v. Maryland.</u>[138]

173. The court's May 1, 2012 order failed to address that the People did not furnish the Verlezza notes prior to the May 2011 conditional examination notwithstanding the fact that it is apparent from the notes the state prosecutor

---

[133] See Exhibits 28, 30, 32; see also Exhibits 36, 37. 40, 41.
[134] See Exhibit 31; see also Exhibit 20 at <u>Affirmation</u> pages 1, 4 and <u>Demand to Produce</u> at pages 8, 9.
[135] See Exhibit 31.
[136] See Exhibit 34.
[137] See Exhibit 32.
[138] Id.

managing the case was aware of Mr. Verlezza's reference to Alzheimer's disease prior to the conditional examination.[139]

174. The motion to reargue posited that the defendant was entitled to a <u>Brady</u> hearing to determine the reasons for the People's failure to provide the defense with exculpatory information consistent with the state prosecutors' obligation pursuant to the Fourteenth Amendment to the United States Constitution.[140]

175. Whether or not Minnie Simmons was suffering from mental defects that could have impacted her ability to perceive and recall material events pertinent to the case was something the defense would have wanted to know and was entitled to know prior to the May 2011 conditional examination.[141]

176. The Plaintiff sought a <u>Brady</u> hearing because the state court should have made an assessment as to whether or not the People's failure to produce the Verlezza notes were deliberate and materially prejudiced the defense.[142]

177. The People did not want the defense to challenge the authenticity of the CPL §190.30(3) affidavit purportedly subscribed by Minnie Simmons in June 2010 just prior to the August 2010 indictment.

178. The June 10, 2010 CPL §190.30 affidavit purportedly signed by Minnie Simmons was a material document presented to the grand jury.[143]

179. If the Plaintiff was aware and in possession of the pre-indictment Verlezza notes he would have had a basis to challenge the People's use in the grand jury of the CPL §190.30(3) statement Minnie Simmons purportedly signed.

---

[139] Compare Exhibit 12 with Exhibits 24, 25, 29, and 34.
[140] See <u>Leka v. Portuondo</u>, 257 F.3d 89, 98-103 (2001); see also Exhibit 32 at ¶3.
[141] See <u>Napue</u> at 269-272; see also <u>United States v. Agurs</u>, 427 U.S. 97, 103-106 (1976); <u>Leka v. Portuondo</u>, 257 F.3d 89, 98-103 (2001).
[142] See <u>Leka</u> at 98-103; see also <u>Lewis v. Connecticut Commander of Corrections</u>, 790 F.3d 109, 123-124 (2d Cir. 2015).
[143] See Exhibit 13.

180. The defense could have challenged the integrity of the grand jury proceedings before the state court prior to trial.[144]

181. This option was denied the defense because the People and Charles Emma continuously lied about their possession of material impeachment information related to a principal witness.[145]

182. This form of misconduct violated the federal constitution by denying the Plaintiff an opportunity to be heard and engage a meaningful opportunity to present the complete defense that he was entitled to pursuant to federal and New York State law.[116]

183. On May 1, 2012 the court determined: "first, nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness; second, as conveyed to the defendant by the court, the records reviewed *in camera* do not substantiate any claims of Alzheimer's disease."

184. The court's assertion that "nothing which occurred at the conditional examination raised any issue as to Ms. Simmons' competency as a witness" resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented during the May 18, 2011 conditional examination.[147]

185. As to the court's claim that "the records reviewed *in camera* do not substantiate any claims of Alzheimer's disease" no proof remains for appellate review. The People, an interested party, lost all of the records reviewed by the court to assess whether or not the Plaintiff was entitled to use them as a part of his defense.[148]

---

[144] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); CPL §210.35(5).
[115] Compare Exhibit 29 at ¶7 and Trial Record at 144, 166-167, 279-280.
[146] See Crane v. Kentucky, 476 U.S. 683, 690 (1986); In re Oliver, 333 U.S. 257, 273 (1948).
[147] See Exhibit 19 at 6-8, 10, 17, 19-25, 27-30, 33, 35, 38, 40-41.
[148] See Exhibit 59 at ¶¶10, 11; see also Exhibit 60 at ¶¶7, 8, 9.

186. The aforesaid People's misconduct violated the federal constitution by denying the Plaintiff a full and fair appellate review for a material <u>Brady</u> violation.[149]

187. Charles Emma and the state prosecutors repeatedly, and over the course of several years, withheld material <u>Brady</u> information in order to prevent the timely revelation of material impeachment disclosures.

188. It should be noted that throughout the <u>Brady</u> disclosure motion practice that took place between the May 2011 conditional examination and the May 2012 order denying the defendant access to Minnie Simmons' psychiatric and medical records not once did the People inform the court of Mr. Emma's knowledge of the reports from Minnie Simmons family of her dementia.[150]Mr. Emma's knowledge of the reports of Minnie Simmons' dementia was not imparted to the defense until the June 2013 trial, more than one year after the May 1, 2012 order.[151]

189. The state prosecutors were reminded of their obligations pursuant to <u>Brady</u> just prior to the May 18, 2011 conditional examination through to the May 1, 2012 order of the court. Notwithstanding, the People deliberately ignored the court's orders during this period so that they could prevail at the end of motion practice engaged to determine whether or not the defense would receive access to Minnie Simmons' medical and psychiatric records.[152]

190. If the court was aware of Mr. Emma's information regarding Minnie Simmons' dementia the outcome of the motion practice initiated by the defense to obtain Minnie Simmons' medical and psychiatric records would have been different.

---

[149] See <u>Brady</u> at 87; see also <u>Fuentes v. T. Griffin</u>, 829 F.3d 233 at 247-253 (2d Cir. 2016).
[150] Trial Record at 144, 166-167, 279-280.
[151] Id.
[152] See Exhibits 22 and 31.

k. The State Court Refused to Allow the Defendant Access to Compulsory Process in Violation of the Federal Constitution.

191. The state courts, beginning more than one year prior to trial, denied the Plaintiff's every request for a subpoena or letter request for disclosure prior to and during the June 2013 trial.

192. The Plaintiff prepared several letter requests for disclosures in 2013 before the trial. Justice William Garnett instructed the Plaintiff to make all disclosure requests to him by letter as opposed to seeking to obtain signed subpoenas.[153]

193. The Plaintiff sought numerous subpoenas from the state court, in earnest, beginning in April 2012 because it appeared that a trial of the matter was imminent. The trial did not take place until June 2013, fourteen months later.

194. Every subpoena request made by the defendant was denied through the trial. The state court denied every subpoena request made by the defense for at least fourteen consecutive months.[151]

195. The Plaintiff sought to subpoena parties to transactions by the estate.

196. The Plaintiff also sought to subpoena Kings County Court records pertinent to the guardianship and the estate. The state prosecutors furnished incomplete copies of court records as a part of an open file discovery practice. The files were incomplete and the defense sought to obtain materials he knew were missing.

197. For example, the Plaintiff had to provide a letter with an itemized list of estate expenditures and prospective expenditures to the Surrogate's Court in order to renew Letters Testamentary. The files of the Kings County Surrogate at the time of the sale of the real property never were made available to the Plaintiff.

---

[153] See Exhibits 51, 52, 53; see also Exhibits 56, 57.
[154] See Exhibit 34; see also Exhibits 51, 52, 53, 56, 57.

198. The reason court files were important to the Plaintiff was because of the "Best Evidence Rule" and also because the Plaintiff lost many of the files pertinent to the guardianship and estate cases due to a flood of his office.

199. The Plaintiff also sought to subpoena policy information from the New York City Human Resources Administration (HRA). HRA attorneys withdrew a petition for a compulsory accounting during the administration of the estate in Kings County Supreme Court.

200. At trial there was a material conflict between an affirmation made by Charles Emma and the testimony of the HRA attorney, Richard Balsam, regarding why the compulsory accounting was withdrawn.[155]

201. The HRA attorney falsely denied during the trial that he advised Mr. Emma that: "they (HRA) withdrew the proceeding only because they believed the estate assets were already distributed because of the sale of the house in December 2005."[156]

202. The Plaintiff sought HRA policies and procedures in anticipation of an effective cross-examination of Richard Balsam, the HRA attorney.[157]

203. HRA's policies were inconsistent with the claims made by Mr. Balsam and consistent with the claims made in Mr. Emma's report.[158]

204. Justice Pesce, notwithstanding the fact he was not a Kings County Surrogate's Court judge and had no jurisdictional authority over the matter, engaged in conversations with HRA officials regarding this matter and asked HRA to investigate it.[159]

---

[155] Compare Trial Record at 769, 772-775 with Exhibit 11.
[156] Trial Record at 772-775.
[157] Trial Record at 772-775.
[158] Compare Exhibit 11 with Trial Record at 315-318, 772-775.
[159] Trial Record at 632; see also Exhibit 4.

205.  The Plaintiff was denied the opportunity to impeach Mr. Balsam with evidence of the agency's policies.[160]

206.  The trial court also refused the Plaintiff's requests to obtain and review a full set of Justice Pesce's records, in part, for the purpose of identifying the HRA officials he claimed to speak to.[161]

207.  The trial court also denied the Plaintiff access to persons who personally observed Minnie Simmons capacity to perceive and recall during pertinent times of the case.[162]

1. The Plaintiff sought a Writ of Prohibition to dismiss the indictment.

208.  On or about October 22, 2012 the Plaintiff sought a Writ of Prohibition seeking the dismissal of Kings County Supreme Court Indictment 4743-2010 because the indictment was obtained fraudulently and therefore was jurisdictionally defective.[163]

209.  The Plaintiff alleged in his writ application that the state prosecutors knowingly presented testimony regarding the mental health of Minnie Simmons, a material witness to the grand jury, that they knew was false in order to mislead the grand jurors and fraudulently obtain an indictment against the Plaintiff.

210.  In the writ Plaintiff alleged that the state prosecutors deliberately withheld information regarding the mental health of Minnie Simmons, a material witness to the grand jury, in order to convey a false portrayal to the grand

---

[160] See Exhibit 34.
[161] Trial Record at 558-559, 632-633; see also Exhibits 51, 52, 53, 56, 57.
[162] See Exhibit 34.
[163] Matter of Mitchell v. DiMango, 100 A.D.3d 1001 (2 Dept. 2012); see also People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

jurors of the capacity of the witness to recall facts and circumstances of the case.[164]

211. In the writ Plaintiff also alleged that the prosecution of the indictment should be discontinued because the district attorney knowingly presented the grand jurors with a fraudulent CPL §190.30(3) affidavit that recited facts purportedly material to the case that was a known fraud: to wit, the affidavit was not signed by Minnie Simmons, the alleged declarant.[165]

212. The prosecutors relied upon this affidavit to secure the indictment for this case in spite of the fact that the purported declarant, Minnie Simmons, stated the signature on the affidavit was not hers.[166]

213. The prosecutions knowing use of false material information during a presentation to the grand jury violated the state and federal constitutional rights of the accused.[167]

214. The state prosecutors responded to the aforesaid allegations of grand jury fraud perpetrated by the People by concealing pertinent information from the Appellate Division: Second Department.

215. The People refer to the Napue violations alleged by the Plaintiff in their response to his writ as passing references that were insignificant to the grand jury presentation.

216. This claim is false. The People were under an obligation to inform the Appellate Division: Second Department and the New York State Court of

---

[164] Compare Exhibits 14, 15 with Exhibit 12; see also Trial Record at 144, 166-167, 279-280.
[165] Exhibit 19; Conditional Examination at 33.
[166] Id.
[167] See People v. Pelchat, 62 N.Y.2d 97, 103-108 (1984); see also Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

Appeals of Charles Emma's April 2008 knowledge of Minnie Simmons' daughter's report to him of her mother's dementia.[168]

217. The People had a duty to correct the record during the writ process and reveal to the state courts information in their possession that they knew was unfavorable to their cause. The state prosecutors violated the federal constitution by concealing the material information about reports of Minnie Simmons' dementia known by them through Charles Emma.[169]

218. Instead, the People concealed crucial and material information from the state courts that would have made a significant difference with respect to the outcome of the writ and the case as a whole.

219. In the writ Plaintiff sought the disclosure of the medical and psychiatric records of Minnie Simmons and a deposition of Charles Emma as a part of his writ application. Had the court known of Mr. Emma's knowledge of the reports of Minnie Simmons' dementia the disclosure application, and likely the writ, would have been granted.

220. The Appellate Division: Second Department denied the Plaintiff's disclosure requests and the writ without knowledge of the information Charles Emma could have provided because the People deliberately concealed the material.

221. But for the People's deliberate federal constitutional violation of the writ application process the Plaintiff's writ would have been granted and the indictment dismissed.

---

[168] Compare Exhibits 14, 15 with Exhibit 12; see also Trial Record at 144, 166-167, 279-280.
[169] Napue v. Illinois, 360 U.S. 264, 269-272 (1959); Brady v. Maryland, 363 U.S. 83, 87 (1963); see also Fuentes v. T. Griffin, 829 F.3d 233, 247-253 (2d Cir. 2016); Leka v. Portuondo, 257 F.2d 89, 99-103 (2d Cir. 2001); St. Germain v. United States, U.S. Dist. LEXIS 9784 (S.D.N.Y. 2004); United States v. Cobb, 271 F.Supp. 159, 163 (S.D.N.Y. 1967).

**m. The Plaintiff's *Singer* and Fourteenth Amendment applications would have been granted but for the People's deliberately false response to defense application for relief.**

222.  The Plaintiff moved to dismiss the indictment pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and New York Criminal Procedure Law §30.20 because of pre-indictment delay on or about January 2013.

223.  The Plaintiff alleged in state court that the state prosecutors deliberately withheld information regarding the onset of Minnie Simmons' dementia from the defense from 2009 to the May 2011 conditional examination in order to gain an advantage in the litigation.

224.  The defense claimed the People engaged in the deliberate spoilage of Minnie Simmons' recollections regarding her instructions and transactions made on behalf of the estate.

225.  The Plaintiff alleged that the People deliberately sought to allow Minnie Simmons' memories of facts and circumstances pertinent to the case to diminish so that she could not remember facts and circumstances favorable to the defense.[170]

226.  The defense argued the People deliberately failed to inform the accused that they knew of reports of Minnie Simmons' dementia so that the defense could not make immediate efforts to try to preserve her recollections or effectively challenge the integrity of the grand jury's findings before a state court judge or tribunal.[171]

227.  The People's repeated false affirmations to the courts with respect to revealing the reports of Minnie Simmons' dementia were evidence of bad faith efforts by

---

[170] United States v. Lovasco, 431 U.S. 783, 788-795 (1977); see also United States v. Marion, 404 U.S. 307, 320, 324 (1971); People v. Singer, 44 N.Y.2d 241, 253-255 (1978).
[171] See Napue at 269-272; see also Pelchat at 103-108; see CPL §210.35(5).

the state prosecutors to impede the defense from finding out the truth regarding Minnie Simmons' pre-indictment mental capability in order to conceal information unfavorable to their cause.[172]

228. The People knowingly and deliberately replied falsely to the defense motion to gain an advantage in the litigation.

229. In Paragraph 16 of their response to the defendant's <u>Singer</u> and Fourteenth Amendment application the state prosecutor falsely affirmed that: "Charles Emma confirmed that he has never been aware of any mental condition afflicted Minnie Simmons, diagnosed or otherwise."[173]

230. Charles Emma testified, under oath, at trial that Minnie Simmons' daughter told him in 2008 that her mother was suffering from dementia.[174]

231. The People put forth the aforesaid false affirmation in their response to the Plaintiff's motion a few months before the trial in order to defeat the defense motion to dismiss pursuant to <u>Singer</u> and the Fourteenth Amendment.

232. The state prosecutors deliberately sought to mislead the trial court with respect to the validity of defendant's <u>Brady</u> applications for Minnie Simmons' medical and psychiatric records in order to defeat the defense motion to dismiss because of a violation of the Fourteenth Amendment to the United States Constitution.

n. <u>Pre-trial Applications.</u>

233. The accused pre-trial applications included the Plaintiff's repeated invocations of the Sixth Amendment to the United States Constitution in a futile effort to convince the trial court that he was entitled to the notes and correspondence

---

[172] <u>Arizona v. Youngblood</u>, 488 U.S. 51, 56-58 (1988); see also Exhibits 29, 38, 39.
[173] See Exhibit 10.
[174] Trial Record at 144, 166-167, 279-280; compare Exhibits 14, 15 with Exhibit 12.

prepared by the People's most important witnesses as of the time those witnesses testified at trial.[175]

234. The case was in a trial mode by early March 2013 because two significant pre-trial motions to dismiss were resolved by March 5, 2013.[176]

235. The Plaintiff placed on the record the severity of his concerns for obtaining access to disclosures that would help him defend against the indictment as early as April 24, 2012, more than a year before the trial.

236. Justice Kamins was the chief judge of the criminal division at that time. In the April 2012 letter the defense told Judge Kamins that the courts presiding over his case were refusing to sign subpoenas for the defense to obtain non-privileged materials relevant to the defense.[177]

237. The materials sought included a request for court records and communications by and to the court by third parties with information relevant to the case.[178]

238. Justice Kamins never responded to the letter and Justice Walsh denied all of the relief sought by the letter.[179]

239. The defense wrote three letters to the trial court between January and June 2013 (at the trial court's suggestion) seeking court orders directing the disclosures from the People's witnesses (especially the lawyers) of the notes, memoranda, and correspondence from witnesses the state prosecutors intended to call during the trial.[180]

---

[175] See Exhibit 49 the Pre-trial conference 6/10/13 at 10-14, 16-17, 23-24, 47, 58-59, 70-73; see also Exhibit 50 at Pre-trial conference 6/11/13 at 19-22, 26-31.
[176] See Exhibits 40, 41.
[177] See Exhibit 35.
[178] Id.
[179] See Exhibit 34.
[180] See Exhibits 51, 52, 53.

240. On June 3, 2013, more than one week before trial, the defense followed up two earlier 2013 requests and asked the trial court to order the production of the files of the persons listed on the People's witness list.[181]

241. The defense made specific requests for the files of the People's most important witness on their witness list, Justice Michael Pesce, more than a week before the trial and two weeks before Justice Pesce testified.[182]

242. Justice Pesce testified that he prepared notes and maintained a separate file regarding matters relevant to the trial.[183]

243. For example, Justice Pesce's notes included the names of HRA witnesses he said he spoke to about facts and circumstances relevant to the case.[184]

244. Justice Pesce refused to surrender his files as a matter of course and the trial court did not overrule his refusal.[185]

245. The Plaintiff invoked the Sixth Amendment to the United States Constitution several times during pre-trial discussion in order to try to convince the court that he should have access to the files and notes of witnesses for the prosecution.[186]

246. The court explicitly indicated that the trial court for this case was far more concerned with expedience than the enforcement of commands of the Sixth Amendment to the United States Constitution on behalf of the defense.[187]

---

[181] See Exhibit 53; see also Exhibits 51, 52, 58.
[182] See Exhibit 58; see also Exhibit 49 June 10, 2013 Pre-trial conference at 12-14; see also Exhibits 51, 52, 53.
[183] See Trial Record at 558-559, 632-633.
[184] Trial Record at 632-633.
[185] Trial Record at 558-559, 632-633.
[186] Compare Exhibits 51, 52, 53 with Exhibit 50 the Pre-trial conference 6/11/13 at 22, 26-31.
[187] See Exhibit 50 the Pre-trial conference 6/11/13 at 22, 26-31.

247. The trial court ignored all of the defendant's diligent efforts to acquire relevant disclosure materials prior to and during the trial. The court denied the requests for disclosures that were made in the several 2013 pre-trial and trial letters to the court and during the pre-trial conferences. The court then closed discovery during the pre-trial conferences and during the trial.[188]

248. The court also refused to re-consider the decision to compel the disclosure of relevant court records, memoranda, and notes prepared by the People's most important witness, Justice Pesce, notwithstanding the fact that the defense made specific requests for these materials and Justice Pesce conceded their relevance and existence.[189]

249. One of the most important components of the defense for this case was to establish for the jury that Justice Pesce had no lawful jurisdictional authority over the Estate of Charles Brown.[190]

250. The defendant's claim that Justice Pesce lacked jurisdiction was conceded in an opinion written by Justice Pesce as a part of the Brown Guardianship Matter in February 2010.[191]Both the trial court and the state prosecutors were aware of the aforesaid decision and order by Justice Pesce prior to trial.[192]

251. The defense raised this issue during the pre-trial conferences in order to place the trial court and the People on notice that the state prosecutors' assertions of consciousness of guilt were disingenuous and would be rebutted by the

---

[188] Id.; see also Exhibits 56, 57.

[189] See Exhibit 49 Pre-trial conference 6/10/13 at 58-59, 70-73; see Exhibit 50 the Pre-trial conference 6/11/13 at 22, 26-31; see also Exhibits 56, 57; Trial Record at 558-559, 632-633.

[190] Trial Record at 184-185, 340-341, 899-900, 1007-1011, 1148; See Exhibit 49 Pre-trial conference 6/10/13 at 50-55.

[191] See Exhibit 4; Matter of Charles Brown, Index No. 107103-99 at 2 (Kings County Supreme Court, Feb. 24, 2010)(Pesce, J.); see Exhibit 49 Pre-trial conference 6/10/13 at 50-55; see also Exhibit 50 Pre-trial conference 6/11/13 at 37-39.

[192] Trial Record at 899-900.

defendant's factual assertion that Justice Pesce lacked lawful jurisdiction over the estate.[193]

252.    The trial court reserved decision regarding this issue at the end of the pre-trial conferences but, at trial, the court precluded the defense from challenging Justice Pesce's patently false claim of jurisdiction over the estate during the trial.[194]

253.    Justice Pesce and the state prosecutors knowingly offered false material testimony regarding his jurisdictional authority over the estate and the trial court refused to allow the accused to cross-examine Justice Pesce with his own February 24, 2010 order or other materials to impeach him.[195]

254.    Further, in spite of prior notice of the importance of this issue for the defense, the trial court refused to charge the jury regarding the law that denied Justice Pesce's jurisdictional authority over the Estate of Charles Brown.[196]

255.    Justice Pesce's false representations to the jury were not corrected by the trial court or the People. Worse the court refused to instruct the jurors that Justice Pesce's testimony was to be treated as any other witness testimony and that the trial judge would give the instructions on the law.[197]

o. The Trial.

256.    The Plaintiff was denied a fair trial in violation of the federal constitution. The trial court allowed the state prosecutors to elicit known false testimony from Justice Pesce in order to win a conviction.[198]

---

[193] Id.
[194] Trial Record at 184-185, 340-341, 899-900, 1007-1011, 1148; see also Trial Record at 611, 658.
[195] Trial Record at 611, 658, 900, 1115-1116; see also Trial Record at 184-185, 340-341, 1007-1011, 1148.
[196] See Exhibit 49 Pre-trial conference 6/10/13 at 50-55; see also Exhibit 50 Pre-trial conference 6/11/13 at 37-39; see also Trial Record at 1007-1011; see also Exhibits 56-57.
[197] See Exhibit 49 Pre-trial conference 6/10/13 at 96.
[198] Trial Record at 611, 658, 900, 1115-1116.

257. Both the state prosecutors and the trial judge knew Justice Pesce falsely was testifying with respect to a material issue of the case when he claimed that he was in charge of the Brown Estate.[199]

258. The People, with Justice Pesce, concocted the claim that Justice Pesce was in charge of the Brown Estate because they believed Minnie Simmons would be an unreliable witness for them. The state prosecutors allowed Justice Pesce's known false testimony to stand without correction because without the testimony of the executor of the estate the People would not have an appropriate permission and authority witness necessary to support the larceny charge.[200]

259. Larceny is not a strict liability crime and without evidence of criminal intent, in this case established by a lack of permission or authority from the executor, the People's case is insufficient as a matter of law.[201]

260. The state prosecutors, with the aid of the trial court and Justice Pesce, substituted Justice Pesce's mendacious claim of authority over the estate in order to support a material component of the larceny charge in violation of the federal constitution.[202]

261. The trial court savaged the defense by refusing to allow the accused to cross-examine Justice Pesce and his agent, Charles Emma, regarding whether or not they had lawful jurisdictional authority to demand an accounting of the estate's assets and argue they had no lawful authority to determine the use of the estate's assets.[203]

---

[199] Compare Trial Record at 611, 900, 1115-1116 with Trial Record 899-900 and Exhibit 4 at page2.
[200] People v. Zona, 14 N.Y.3d 488, 493-495 (2010); People v. Chesler, 50 N.Y.2d 203, 209-210 (1980); People v. Ricchiuti, 93 A.D.2d 842, 844-845 (2 Dept. 1983).
[201] See Chesler at 209-210; Ricchiuti at 844-845.
[202] Napue at 269-272.
[203] Trial Record at 184-185, 340-341, 1007-1011, 1148.

262. The court's refusal to allow cross-examination regarding a material issue for the case denied the accused his Sixth Amendment right to confront witnesses against him and his Fourteenth Amendment right to a fair trial.[204]

263. The accused would have been able to refer Justice Pesce to his own writings to demonstrate that he did not have lawful authority to be in charge of the Brown Estate.[205]

264. Later, the court catastrophically destroyed any semblance of a fair trial by refusing to charge the jurors with New York law that would have demonstrated that neither Justice Pesce nor his agent, Charles Emma, had any lawful authority with respect to the determination of the disposition of the assets of the Estate of Charles Brown.[206]

265. The trial court also precluded the defendant's use of a material expert witness, Ian Nelson.[207]

266. The People called a financial witness, Charles Emma, that exaggerated the legitimacy of his financial examination. Mr. Emma testified that he engaged in a "forensic" examination of the accused financial records in order to assess whether or not the accused stole monies from the estate.[208]

267. The People also summoned other so called "financial investigators" who described transactions from the defendant's attorney trust accounts without any context. Although the People's "financial investigators" created charts and had records of the transactions from the attorney trust accounts they examined

---

[204] Davis v. Alaska, 415 U.S. 308, 315-318 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 679-680, 684 (1986); Crane v. Kentucky, 476 U.S. 683, 690 (1986).
[205] Id. see also Exhibit 4 at page 2; see also Exhibit 25.
[206] Id.; see also Cupp v. Naughten, 414 U.S. 141, 147 (1973); Jackson v. Edwards, 404 F.3d 612, 624-628 (2d Cir. 2005); see also Trial Record at 1007-1011.
[207] Trial Record at 924-927.
[208] Trial Record at 21, 22, 33, 295, 297.

they never spoke with Minnie Simmons to determine if any of the expenditures were unauthorized.[209]

268. The Plaintiff never disputed that he spent the money at issue. The People were obligated to prove beyond a reasonable doubt that the Plaintiff spent moneys owned by the estate that he was not authorized to spend or spent moneys that were not for the benefit of the estate.[210]

269. The defense sought to counter the testimony offered by the People's purported "financial experts" to demonstrate the substandard nature of their proof.

270. The defense sought to call a Certified Public Accountant, Ian Nelson. Mr. Nelson was familiar with forensic audits from his experience and practice. He offered to testify that any forensic accounting would involve speaking to the person responsible for the expenditures to ensure those expenditures were authorized or consistent with the goals of the entity.[211]

271. Neither Mr. Gillon nor Mr. Emma ever met or spoke with Minnie Simmons.[212]

272. Mr. Gillon's charts never were reviewed by Minnie Simmons.[213]

273. The United States Supreme Court has recognized that a common defense tactic is to discredit the caliber of the prosecutions' investigation. This tactic is a part of a complete defense.[214]

[209] Trial Record at 280, 461; see also Chesler at 209-210; Ricchiuti at 844-845.
[210] People v. Ricchiuti, 93 A.D.2d 842, 844-845 (2 Dept. 1983); People v. Chesler, 50 N.Y.2d 203, 209-210 (1980).
[211] Trial Record at 913-914; see People v. Zona, 14 N.Y.3d 488, 493-495 (2010); Ricchiuti at 844-845; Chesler at 209-210.
[212] Trial Record at 280, 461.
[213] Id.
[214] Kyles v. Whitley, 514 U.S. 419, 446-447 (1995); see also Crane at 690.

274. The defense was entitled to an expert witness to counter the substandard nature and presentation of the People's financial witnesses.[215]

275. The People's witnesses established that monies were spent but could not establish that the monies spent were not authorized to be spent by the executor of the estate; the executor was the only person lawfully authorized by the State of New York to determine and approve Brown Estate expenditures.[216]

### p. The Appeal

276. The judgment of conviction took place May 23, 2014. The Plaintiff, timely, filed his Notice of Appeal with the state court June 9, 2014.

277. The appellant's brief emphasized the federal constitutional violations that occurred during the pre-indictment, post-indictment, pre-trial, and trial phases of the litigation.

278. The state appellate courts ignored nearly every federal constitutional claim made by the Plaintiff and failed to address the federal constitutional claims with any specificity or detail.[217]

279. The appellant argued that the state prosecutors did not establish beyond a reasonable doubt each and every element of the larceny charge in violation of the Fourteenth Amendment to the United States Constitution.[218]

280. The appellant argued that his Fourteenth Amendment rights were violated because the People could not establish the permission and authority prong of

---

[215] Id; see also Washington v. Texas, 388 U.S. 14, 19 (1967); Pointer v. Texas, 380 U.S. 400 (1965); Davis at 315-318; Crane at 690; In re Oliver, 333 U.S. 257, 273 (1948).
[216] See New York EPTL §11-1.1(b)(13 and (22); In Re Leopold's Estate, 259 N.Y. 274 at 276-278 (1932); Scully v. Scully, 201 N.Y. 61, 64 (1911); In the Matter of Stanley, 240 A.D.2d 268, 269-270 (1 Dept. 1997); In the Matter of Rappaport, 102 Misc. 910 at 911 (Surrogate's Court, Nassau County 1980).
[217] See Exhibit 26.
[218] See Jackson v. Virginia, 443 U.S. 307, 317-319 (1979); see also In re Winship, 397 U.S. 358, 362-364 (1970).

the larceny charge without the use of testimony the state prosecutors knew was false that was provided by Justice Pesce.

281. The state appeals courts ignored the fact that the prosecutors never corrected Justice Pesce's false testimony.

282. The People never sought to confront New York State law with respect to whether Justice Pesce had lawful authority to determine the use of the estate's funds.[219]

283. Justice Pesce did not and his own words confirmed the appellant's claim that he lacked the authority to determine the use of the *Brown* estate's funds.[220]

284. The intermediate appeals court and the Court of Appeals of the State of New York disregarded well settled New York law and Justice Pesce's own words in order to excuse the fact that a judicial colleague testified falsely in order to assist the state prosecutors to obtain a conviction in violation of the Fourteenth Amendment to the United States Constitution.[221]

285. As noted above Justice Pesce deliberately testified falsely about his jurisdictional powers over the estate during the trial. The state intermediate appellate court and the New York Court of Appeals excused Justice Pesce's offer of false testimony by their colleague by concluding his testimony was "marginally relevant and collateral."

286. The truth is Justice Pesce's testimony was the most important testimony for the People's case. Justice Pesce was the only People's witness to testify that

---

[219] See New York EPTL §11-1.1(b)(13 and (22); In Re Leopold's Estate, 259 N.Y. 274 at 276-278 (1932); Scully v. Scully, 201 N.Y. 61, 64 (1911); In the Matter of Stanley, 240 A.D.2d 268, 269-270 (1 Dept. 1997); In the Matter of Rappaport, 102 Misc. 910 at 911 (Surrogate's Court, Nassau County 1980).
[220] See Exhibit 4 at page 2; see also Exhibit 25.
[221] See Exhibit 26; the November 18, 2020 Decision and Order of the Supreme Court of the State of New York Appellate Division: Second Department; see also Napue at 269-272; see also Jackson at 317-319.

he had the authority to determine the use of the monies owned by the Brown Estate.[222]

287.   Justice Pesce's known false testimony offered in support of known false claim regarding a material issue of the case violated the Plaintiff's Fourteenth Amendment right to a fair trial.[223]

288.   The state intermediate appellate court and the New York Court of Appeals failed to review the federal constitutional import of Justice Pesce's offer of known false testimony and the People's failure to correct it once it was offered.[224]

289.   The state intermediate appellate court and the New York Court of Appeals also failed to address the trial court's efforts to protect his colleague. The trial court denied the Plaintiff his right to cross-examine Justice Pesce on a material issue of the case, jurisdictional authority, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.[225]

290.   Further, the trial court sought to protect Justice Pesce by refusing to construct a charge on the law regarding the extent of his judicial colleague's lawful authority with respect to the Brown Estate.[226]

291.   The trial court's refusal to charge the jury with the law regarding the extent of Justice's Pesce's jurisdictional authority concerning the Brown Estate was catastrophic to the defense and violated the Fourteenth Amendment to the United States Constitution. The decision denied the accused a fair trial.[227]

---

[222] Trial Record at 611.
[223] Napue at 269-272.
[224] See Exhibit 26; see also Napue at 269-272.
[225] Trial Record at 184-185, 340-341, 1007-1011, 1148; see also Washington v. Texas, 388 U.S. 14, 19 (1967); Pointer v. Texas, 380 U.S. 400 (1965); Davis at 315-318; In re Oliver, 333 U.S. 257, 273 (1948); Davis v. Alaska, 415 U.S. 308, 315-318 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 679-680, 684 (1986); Crane v. Kentucky, 476 U.S. 683, 690 (1986).
[226] Trial Record at 1007-1011; see also Exhibits 56, 57; see also Exhibits 4 and 25.
[227] Cupp v. Naughten, 414 U.S. 141, 147 (1973); Trial Record at 1007-1011.

292.   The intermediate appellate court and the New York Court of Appeals elected not to address the Plaintiff's federal constitutional claim of undue delay.[228]

293.   The Plaintiff contended that the state prosecutors deliberately engaged in untoward pre-indictment delay from at least 2009 in order to ensure that Minnie Simmons was useless as a witness for the defense in violation of the Fourteenth Amendment to the United States Constitution.[229]

294.   The People were on notice of reports of Minnie Simmons dementia since 2009. Instead of alerting the courts and the defense of her condition prior to the August 2010 indictment the People concealed this information throughout the entire pre-trial period of the case.

295.   The People deliberately impeded every effort by the defense to discover material information pertaining to the mental capabilities of Minnie Simmons by the proffer of numerous false affirmations, in violation of specific Brady requests, in order to prevent the defense from using information regarding her mental incapacity to defend against the charges.

296.   The People went so far as to lose medical and psychiatric records reviewed by the trial court in order to avoid appellate review.[230]

297.   The intermediate appellate court and the New York Court of Appeals denied this federal constitutional claim as one without merit.[231]

298.   The intermediate appellate court and the New York Court of Appeals failed to address the Plaintiff's contention that the People knowingly made use of a false

---

[228] See Exhibits 26 and 41.
[229] See United States v. Marion, 404 U.S. 307, 320, 324 (1971); United States v. Lovasco. 431 U.S. 783, 788-795 (1977); Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988); see also Exhibits 37, 41.
[230] See Exhibits 59 and 60.
[231] Exhibit 26.

material document, a fraudulent CPL §190.30 affidavit, in the grand jury to obtain the indictment and later win a conviction after trial.

299. The Plaintiff contended that the People's knowing use of a false material document before the grand jurors violated his Fourteenth Amendment rights pursuant to the United States Supreme court ruling in <u>Napue</u>.[232]

300. The intermediate appellate court and the New York Court of Appeals denied this federal constitutional claim as one without merit.[233]

301. The Plaintiff also asserted that the state court violated his Sixth and Fourteenth Amendment rights by denying him, Ian Nelson, as an expert witness to refute the People's financial witnesses.

302. The Plaintiff sought to call Ian Nelson to establish a material flaw in the People's case; that although the state prosecutors established that monies were spent by the Plaintiff from the Brown Estate proceeds the People failed to prove that there was no authorization by the executor to spend these monies.

303. Ian Nelson's expertise was crucial to the defense and it was a denial of the Plaintiff's Sixth and Fourteenth Amendment rights to deny his testimony.[234]

304. The intermediate appellate court and the New York Court of Appeals denied this federal constitutional claim as one without merit.[235]

305. The intermediate appellate court and the New York Court of Appeals erred with respect to the Plaintiff's Sixth and Fourteenth Amendment claims

---

[232] See Napue at 269-272.
[233] See Exhibit 26.
[234] <u>Kyles</u> at 446-447; <u>Washington</u> at 19; <u>Crane</u> at 690; <u>Davis</u> at 315-318; <u>Pointer</u> at 403-408; <u>Van Arsdall</u> at 679-680, 684; see also <u>Howard v. Walker</u>, 406 F.3d 114, 131-135 (2d Cir. 2005).
[235] Exhibit 26.

because of the trial court's refusals to grant the disclosures of the files of witnesses the People intended to call.

306. The issue was well preserved because it was raised several times during pre-trial proceedings in writing and on the record.[236]

307. The trial court refused to follow its own orders and direct the delivery of witness files (particularly of Justice Pesce) so that the Plaintiff could fully and fairly cross-examine material witnesses for the People's case.

308. The trial court's refusal to direct the delivery of trial witness files during the examination of the witness violated the Sixth and Fourteenth Amendment rights of the accused.[237]

309. The intermediate appellate court and the New York Court of Appeals failed to address this federal constitutional claim with any specificity in the opinion.

310. The Supreme Court Appellate Division: Second Department denied relief on November 18, 2020 and the Court of Appeals of the State of New York denied leave to appeal March 31, 2021.[238]

## SUPPORT FOR THE MONELL CLAIM

### Support for the 42 U.S.C. §1983
### 5th, 6th, and 14th Amendment Claims
### Against the City of New York pursuant to Monell

311. Plaintiff asserts a Monell claim against the City of New York. This claim is derived from the United States Supreme Court decision in Monell v. Dept. of Social Services, 436 U.S. 658 (1977).

---

[236] See Exhibits 51, 52, 53; see also Exhibit 49 June 10, 2013 Pre-trial conference at 12-14.
[237] Exhibit 50 Pre-trial conference 6/11/13 at 19-22, 26-31; see Washington at 19; Crane at 690; Davis at 315-318; Van Arsdall at 679-680, 684; In re Oliver at 273; Brady at 87; see also Pennsylvania v. Ritchie, 480 U.S. 39 (1987).
[238] See Exhibits 26 and 27.

312. A plaintiff may allege municipal liability for federal constitutional violations that occurred pursuant to a "governmental custom, policy, or usage of the municipality."[239]

313. A Monell claim requires Plaintiff to establish three elements: (1) an official policy or custom that; (2) causes Plaintiff to be subjugated to; (3) the denial of a constitutional right.[240]

314. A municipality's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

315. Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under 42 U.S.C. §1983.[241]

316. A claim of deliberate indifference also may be framed as a claim regarding the municipal defendant's failure to train, supervise, and discipline its employees. Plaintiff alleges the KCDA office's training and discipline policies and practices were consciously designed to permit and encourage violations of the federal constitution and the holdings of the United States Supreme Court cases of Brady and Napue.[242]

317. To assert municipal liability based on a failure to train, "the plaintiff must show: [1] that a policymaker knows "to a moral certainty" that their employees will confront a given situation; [2] that the situation either presents the

---

[239] Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012).
[240] See O'Hara v. City of New York, 2019 U.S. Dist. LEXIS 91551 *25-27 (E.D.N.Y. 2019).
[241] Collins v. City of New York, 923 F. Supp.2d 462, 476 (E.D.N.Y. 2013).
[242] Brady v. Maryland, 373 U.S. 83, 87 (1963); Napue v. Illinois, 360 U.S. 264, 269-272 (1959).

employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and [3] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.[243]

318. Multiple federal district courts in the Eastern District of New York within the past few years have ruled that the City of New York may be held liable pursuant to <u>Monell</u> for customs and practices that include the knowing prosecutorial use of perjured testimony and the withholding of exculpatory evidence favorable to the accused in prosecutions by the KCDA during its stewardship under Charles Hynes and his successors, as similarly alleged in this case.[244]

319. Defendant City of New York acts through policymaking officials for the KCDA. At the time of Stephen T. Mitchell's arrest, policymaking officials for the KCDA engaged in the following misconduct, which was reflected, and led to the false conviction for Kings County Supreme Court Indictment: 4743-2010: (1) acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; (2) implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of KCDA prosecutors and investigators not to fabricate evidence and to accurately report the nature of their investigations to the court and defense when appropriate and to other prosecutors; (3) for  KCDA prosecutors to properly document and disclose *Brady* information; (4) and for prosecutors not

---

[243] <u>Davis v. City of New York</u>, 2017 U.S. Dist. LEXIS 143678 **12, 13 (E.D.N.Y. 2017).
[244] <u>O'Hara v. City of New York</u>, 2019 U.S. Dist. LEXIS 91551 **25-27 (E.D.N.Y. 2019); <u>Collins v. City of New York</u>, 923 F. Supp.2d 462, 476-478 (E.D.N.Y. 2013); <u>Davis v. City of New York</u>, 2017 U.S. Dist. LEXIS 143678 **22-28 (E.D.N.Y. 2017); <u>Bailey v. City of New York</u>, 79 F. Supp.3d 424, 441-443 (E.D.N.Y. 2015); <u>Walker v. City of New York</u>, 974 F.2d 293, 300 (2nd Cir. 1992).

to commit misconduct such as by giving false and misleading affirmations in support of motions, arguments to the court, or summations.

320. Mr. Mitchell's case was not a random miscarriage of justice in an otherwise functioning law enforcement regime. A report from an independent body demonstrates that Defendant City of New York, during the relevant time period of Stephen T. Mitchell's prosecution and appeals, was plagued by institutional deficiencies that allowed a wanton and reckless culture to develop within the KCDA. This culture allowed employees of the KCDA to violate constitutional rights of the citizens of the City of New York without disciplinary risk or repercussions.

321. In 2009, the New York State Bar Association's Task Force on Wrongful Convictions released an investigative report covering 53 cases. It found that "government practices" contributed to more than 50% of New York wrongful convictions, including prosecutors' violating Brady obligations.

322. The Task Force recommended "Train[ing] and Supervis[ing] in the Application of *Brady* and Truthful Evidence Rules" for police. For prosecutors, the Task Force noted that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show such conduct still occurs." The Task Force therefore suggested that, to the extent not already in existence, prosecutor's offices should create procedures to evaluate and impose sanctions for prosecutorial misconduct.

323. In the time leading up to Mr. Mitchell's arrest, indictment, trial, and post-conviction litigation, the KCDA did not put such procedures into effect.

324. In numerous other cases after Charles Hynes became District Attorney of Kings County prosecutors failed to disclose to the defense that key prosecution

witnesses had been arrested and were being held in police custody until they completed their testimony for the prosecution.

325. Near the time of Mr. Mitchell's prosecution, former DA Hynes, as the manager, chief administrator and policymaker of the KCDA, a City agency, created and maintained policies, customs, and usages of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (i)manufacturing false and misleading evidence and testimony through improper coercion of witnesses; (ii) knowingly presenting false testimony and arguments at criminal proceedings; (iii)suppressing *Brady* information; (iv) unlawfully arresting, imprisoning, and coercing witnesses; (v) abusing material witness orders, subpoenas, "*Damiani*" orders, and other court process; and (vi) covering up these unlawful practices.

326. These policies, customs, and usages have led the United States Court of Appeals for the Second Circuit and numerous courts within this District to recognize analogous Section 1983 *Monell* claims brought by other wrongfully convicted persons. *See, e.g., Walker v. City of New York,* 974 F.2d 293, 300-01 (2d Cir. 1992) (reversing district court's dismissal of *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Bailey v. City of New York,* 79 F. Supp. 3d 424, 441-43 (E.D.N.Y 2015) (denying City's summary judgment motion on a *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Collins,* 923 F. Supp. 2d at 477 (denying City's motion to dismiss a *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of

defendants' constitutional rights, including failure to disclose information concerning a material witness order and other court processes).[245]

327. These policies, customs, and usages persisted from former DA Hynes's induction as District Attorney in 1990 through (and, in certain respects, beyond) the end of his tenure as District Attorney in 2013.

328. Former DA Hynes, as a matter of policy, custom, and practice permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the KCDA.

329. These policies, customs, and usages proximately caused the violations of Mr. Mitchell's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

330. Former DA Hynes's policy and practice was to tolerate, fail to discipline, and encourage violations of his office's constitutional obligations to make timely disclosure to the defense of *Brady* information. This was done in Mr. Mitchell's case and former DA Hynes, with the KCDA's, deliberate indifference to such violations created an "anything goes" or "do whatever it takes to win a conviction" atmosphere that caused such violations to continue, including in Mr. Mitchell's case.

331. Former DA Hynes's policy and practice also was to tolerate, fail to discipline, and encourage violations of his office's constitutional obligations to provide the court with truthful material affirmations and arguments in support of or in opposition to motions and during summations. Former DA Hynes, with the

---

[245] See also O'Hara v. City of New York, 2019 U.S. Dist. LEXIS 91551 *25-27 (E.D.N.Y. 2019); Davis v. City of New York, 2017 U.S. Dist. LEXIS 143678 **12, 13, 22-28 (E.D.N.Y. 2017).

KCDA's, deliberate indifference to such violations created an "anything goes" "do whatever it takes to win a conviction" atmosphere that caused such violations to continue, including in Mr. Mitchell's case.

332. Under Former DA Hynes's office-wide policies, customs, and usages, prosecutors and investigators were permitted and encouraged to use illegal tactics to coerce witnesses to testify in the manner prosecutors desired, constituting *Brady* and other constitutional violations, including by:

(a) lying to courts about their need for and entitlement to material witness arrest warrants, and thereby obtaining authorization to arrest witnesses the KCDA viewed as uncooperative;

(b) abusing material witness orders by failing to bring witnesses directly before the court for appointment of counsel and a judicial hearing (as material witness orders require), and instead implementing the KCDA's "Hotel Custody" Program: kidnapping witnesses and holding them either in the KCDA or in a hotel room, where they would threaten, intimidate, or cajole them into becoming what prosecutors considered cooperative, and keeping the witnesses in the custody of the KCDA until they testified for the prosecution;

(c) issuing and executing improper "office" subpoenas to compel witnesses to attend interviews at the KCDA, despite numerous judicial decisions making clear that such process was unlawful;

(d) misleading courts to issue orders (including "*Damiani*" orders and orders to produce) allowing them to take custody of incarcerated witnesses, in many cases without their counsel or against their will, and bringing them to the KCDA where ADAs would threaten, intimidate, or cajole the witnesses into becoming what prosecutors considered cooperative;

(e) causing the New York State Division of Parole and the State Department of Corrections to illegally revoke the release of prisoners so that prosecutors could gain custody of them and threaten them with indefinite imprisonment unless they "cooperated" by testifying favorably for the prosecution; and

(f) coercing witnesses who have been arrested on unrelated charges to "cooperate" by exploiting their drug withdrawal and dependency, holding them prisoner in remote locations while threatening to interrogate them indefinitely, and threatening harsh prosecution and imprisonment while

simultaneously holding out the inducements of leniency and monetary reward;

(g) encouraging judicial officers and their agents deliberately to testify falsely under oath or deliberately mislead fact finders;

(h) to conceal or impede the disclosure of exculpatory or impeachment materials in order to prevent an effective cross-examination of prosecution witnesses.

333. Under former DA Hynes's office-wide policies, customs, and usages, prosecutors and investigators were permitted and encouraged to refrain from making any record of *Brady* information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense, despite the fact that disclosure of such information was and is constitutionally required regardless of whether the information was recorded in written form.

334. Former DA Hynes's training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

335. Prosecutors and investigators were trained on avoiding the creation of *Brady* and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize non-disclosure by subjectively assessing the information as "unreliable" or "incredible" and encouraged to cover up *Brady* information kept hidden by other members of the KCDA.

336. Prosecutors were permitted and encouraged not to comply with the KCDA ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and through FOIL requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the KCDA and defeating defendants' efforts to expose misconduct and overturn wrongful convictions. Many of these forms of misconduct were perpetrated against the Plaintiff.

337. Prosecutors, in violation of *Brady*, were permitted or encouraged to refrain from disclosing material witness applications, orders, and proceedings; arrest and incarceration of trial witnesses; relocation and other assistance promised or provided to witnesses; and other pressure tactics, promises, and rewards used to influence witnesses.

338. Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), former DA Hynes encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements. To the contrary, prosecutors who violated defendants' due process rights were promoted, praised, given pay raises, and otherwise endorsed by former DA Hynes and his Office.

339. Former DA Hynes had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other constitutional violations by prosecutors or investigators. In fact, there was no such process or penalties.

340. Despite dozens of court decisions finding that prosecutors had wrongfully withheld information, in violation of *Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in conduct that misled courts, juries, defendants, and defense attorneys, none of the prosecutors involved was disciplined.

341. Stunningly, not once during his 24 years in office did former DA Hynes terminate a KCDA prosecutor for prosecutorial misconduct.

342. Former DA Hynes had ample notice of the prosecutorial and investigative misconduct occurring in his office.

343. Examples of the decisions that put former DA Hynes on notice of the unlawful conduct being committed by his prosecutors and investigators, before such unlawful conduct led to Mr. Mitchell's false conviction, include:

- *Walker,* 974 F. 2d 293 - Second Circuit upheld *Monell* claim against City of New York for unlawful policies of Brooklyn KCDA that allegedly resulted in withholding of *Brady* material causing plaintiff's wrongful conviction and 18-year imprisonment.
- *People v. Vilardi,* 542 N.Y.S.2d 238 (2d Dep't 1989) - Vacating conviction based on prosecutor's failure to turn over exculpatory police report.
- *People v. Lugo,* 544 N.Y.S.2d 985 (2d Dep't 1989) - Granting motion to vacate conviction based on *Brady* and *Rosario* violations, holding that *Rosario* violation clearly undermined conviction, rendering further *Brady* analysis unnecessary.
- *People v. Lyking,* 537 N.Y.S.2d 314 (2d Dep't 1989) - Prosecutor's improper summation deprived defendant of a fair trial and required reversal of conviction. *People v. Rayford,* 158 A.D.2d 482 (2d Dep't 1990) - Prosecutor suppressed exculpatory information concerning use of suggestive identification procedures.

- *People v. Nedrick,* 166 A.D.2d 725 (2d Dep't 1990) - Prosecutor failed to disclose tape-recorded impeachment material.
- *People v. Anderson,* 160 A.D.2d 806 (2d Dep't 1990) - Prosecutor failed to timely disclose impeachment material.
- *People v. Brazzeal,* 172 A.D.2d 757 (2d Dep't 1991) - Prosecutor's improper summation violated defendant's due process rights.
- *People v. Faison,* 176 A.D.2d 752 (2d Dep't 1991) - Prosecutor failed to timely disclose witness's prior statement.
- *People v. Crespo,* 188 A.D.2d 483 (2d Dep't 1992) - Mistrial granted due to prosecutor's *Brady* violation.
- *People v. Brown,* 187 A.D.2d 437 (2d Dep't 1992) - Trial court sanctioned prosecutor for *Brady* violation.
- *People v. Cecora,* 186 A.D.2d 215 (2d Dep't 1992) - Prosecution and police failed to disclose interview notes containing potential impeachment information.
- *People v. Hughes,* 181 A.D.2d 132 (2d Dep't 1992) - Hearing required regarding prosecution's failure to disclose exculpatory police report.

- *People v. Inswood,* 180 A.D.2d 649 (2d Dep't 1992) - Prosecution's failure to turn over *Brady* material was error; assigned prosecutor is subsequently promoted, does not receive negative feedback or personnel action.

- *People v. Lebron,* 585 N.Y.S.2d 498 (2d Dep't 1992) – Prosecution's presentation of false testimony that was "completely unbelievable and untrustworthy" required reversal of conviction.
- *People v. Jackson,* 198 A.D.2d 301 (2d Dep't 1993), *affirming* 154 Misc. 2d 718 (Sup. Ct. Kings Cty. 1992) - Prosecutors failed to timely disclose exculpatory statements; conviction reversed.
- *People v. Gurley,* 602 N.Y.S.2d 184 (2d Dep't 1993) - Affirming trial court's grant of post-conviction motion arising from KCDA's suppression of *Brady* information.
- *People v. Stevens,* 199 A.D.2d 441 (2d Dep't 1993) - *Brady* and *Rosario* material improperly withheld; prejudice not sufficient to require reversal.
- *People v. Cortez,* 149 Misc. 2d 886 (Sup. Ct. Kings Cty. 1990) - Prosecutors and police violated *Brady* and court order by intentionally destroying tape containing impeachment material.
- *People v. Young,* 155 Misc. 2d 878 (Sup. Ct. Kings Cty. 1992), *on remand from,* 79 N.Y. 2d 365 (1992) - Failure to disclose impeachment material required new trial; hearing court condemned prosecution for tailoring testimony.
- *People v. Giddings,* 2/21/92 NYLJ 25 (col. 1) (Sup. Ct. Kings Cty. Feb. 21, 1992) - Prosecutor's failure to disclose witness's prior inconsistent statements required conviction to be vacated).

344. Examples of former DA Hynes's ongoing policies and practices, of encouraging, authorizing, and permitting misconduct by his prosecutors and investigators, include: 108. Under Former DA Hynes's policies, customs, and usages, no prosecutor was fired, suspended, fined, or demoted for such misconduct:

- *Leka v. Portuondo,* 257 F.3d 89 (2d Cir. 2001) - Conviction overturned on habeas review due to prosecution's suppression of *Brady* material; prosecutor also misled defense counsel regarding a crucial witness.
- *Boyette v. LeFevre,* 246 F.3d 78 (2d Cir. 2001) - Conviction vacated on habeas review because prosecutors suppressed *Brady* material.
- *Waston v. Greene,* 2009 WL 5172874 (E.D.N.Y. Dec. 30, 2009) - Prosecutors disclosed *Brady* material "too late" for the defense to make use of it even though they were aware of material "more than a year in advance of trial."
- *People v. Scott,* 88 N.Y. 2d 888 (N.Y. 1996) - Prosecution failed to disclose statement regarding polygraph result.
- *People v. Bond,* 95 N.Y. 2d 840 (N.Y. 2000) - Myriad *Brady* violations established at Criminal Procedure Law Section 440.10 hearing, including

failure to disclose material witness proceeding concerning principal witness; conviction reversed due to prosecution's failure to disclose prior unrecorded statements to police by prosecution's main witness that she did not see the shooting about which she testified as an "eyewitness."

- *People v. Calabria,* 94 N.Y.2d 519 (N.Y. 2000) - Prosecutor repeatedly defied court's ruling and made false or misleading argument to jury.
- *People v. Jenkins,* 98 N.Y. 2d 280, 287-88 (N.Y. 2002) (Kaye, C.J., dissenting) - Prosecutor's late disclosure of ballistics report "blind sided" the defense and was inexcusable.

- *People v. Fuentes,* 12 N.Y. 3d 259 (N.Y. 2009) - Prosecutor improperly withheld portion of medical records containing potentially favorable evidence for the defense; two judges find the suppression was "deliberate."
- *People v. Khadaidi,* 201 A.D.2d 585 (2d Dep't 1994) - Conviction reversed for prosecution's failure to disclose interview notes with complainant containing prior inconsistent statement)
- *People v. Alvarado,* 201 A.D.2d 486 (2d Dep't 1994) - Prosecution failed to disclose police reports containing impeachment material; conviction reversed.
- *People v. Barnes,* 200 A.D.2d 751 (2d Dep't 1994) - Prosecutor did not record and did not disclose eyewitness's recantation; conviction not reversed because eyewitness ultimately recanted on the witness stand and was adequately cross- examined.
- *People v. Bramble,* 207 A.D.2d 407 (2d Dep't 1994) - Sanctions upheld for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request.
- *People v. Roberts,* 203 A.D.2d 600 (2d Dep't 1994) - Prosecution delayed one year in disclosing exculpatory witness statement, by which time witness was unavailable; conviction reversed.
- *People v. Neptune,* 161 Misc. 2d 781 (Sup. Ct. Kings Cty. 1994) - Prosecution acted unethically by improperly using invalid subpoena to cause a witness to appear for an interview at the KCDA.
- *People v. Scott,* 216 A.D.2d 592 (2d Dep't 1995) - Prosecutor suppressed reports, including polygraph results indicating key witness was withholding information.

- *People v. Rahman,* 231 A.D.2d 745 (2d Dep't 1996) - Matter remitted for hearing concerning prosecution's apparent improper withholding of witness's cooperation agreement.
- *People v. Perkins,* 227 A.D.2d 572 (2d Dep't 1996) – Prosecutor failed to disclose cooperation agreement with witness.
- *People v. Callendar,* 227 A.D.2d 499 (2d Dep't 1996) - Conviction reversed due to prosecutor's failure to turn over notes of detective's prior statement.

- *People v. Bruce,* 224 A.D.2d 438 (2d Dep't 1996) - Conviction reversed for prosecutor's failure to produce police reports containing impeachment material.
- *People v. Dupont,* Kings County Ind. No. 6287/97 - Prosecutor made misrepresentation by claiming KCDA did not possess physical evidence specifically requested by the defense.
- *People v. LaSalle,* 243 A.D.2d 490 (2d Dep't 1997) - Conviction reversed due to prosecutor's "blatant misrepresentation of the facts" during summation.
- *People v. Gourgue,* 239 A.D.2d 357 (2d Dep't 1997) - Prosecutor put notes of complainant's statements in the form of questions to "circumvent" disclosure obligation; conviction reversed.
- *People v. Hill,* 244 A.D.2d 572 (2d Dep't 1997 - Prosecutor sanctioned for failing to disclose 911 tape.
- *People v. Gramby,* 251 A.D. 2d 346 (2d Dep't 1998) - Prosecutor suppressed and failed to timely disclose 911 tape.

- *People v. Campbell,* 269 A.D.2d 460 (2d Dep't 2000) - Prosecutor's suppression of *Rosario* material, a tape-recorded statement by the complainant, required reversal of conviction.
- *People v. Maddery,* 282 A.D.2d 761 (2d Dep't 2001) - Prosecutor's failure to disclose 911 tape before trial as required by law required reversal of conviction.
- *People v. King,* 298 A.D.2d 530 (2d Dep't 2002) - Prosecutor's failure to disclose 911 tape before trial as required by law required conviction to be reversed.
- *People v. Vielman,* 31 A.D. 3d 674 (2d Dep't 2006) - Reversing conviction because prosecutor's summation rested on a "false premise" and was a "blatant attempt to mislead the jury."
- *People v. Jones,* 31 A.D. 3d 666 (2d Dep't 2006) - Prosecution fails to correct the false testimony of a key witness.
- *People v. Thompson,* 54 A.D. 3d 975 (2d Dep't 2008) - Prosecutor suppressed *Brady* material indicating someone other than the defendant committed the crime.
- *People v. Ramos,* 166 Misc. 2d 515 (Sup. Ct. Kings Cty. 1995) - Due to KCDA policy of not taking notes of witness interviews, trial prosecutor was not aware of information acquired by previously assigned prosecutors for which court had ordered disclosure; conviction vacated on due process grounds.
- *People v. Green,* 10/19/99 N.Y.L.J. p. 30, col. 1 (Sup. Ct. Kings Cty., Oct. 19, 1999) - Prosecution failed to disclose *Brady* material.
- *People v. Davis,* 709 N.Y.S. 2d 345 (Sup. Ct. Kings Cty. 2000) - Prosecution violated court's order to disclose exculpatory evidence to defense before indictment; indictment dismissed.

- *People v. Cannon,* 191 Misc. 2d 136 (Sup. Ct. Kings Cty. 2002) - Prosecution responsible for failure to preserve surveillance photographs.
- *People v. Malik,* 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) - Prosecution's suppression of police report and other documents required vacatur of conviction).
- *People v. Wong,* 16 Misc. 3d 1139(A) (Supreme Court, Kings County 2007)(prosecutor loses key evidence and is sanctioned)
- *People v. Roberts,* 203 A.D.2d 600 (2 Dept. 1994)(Delay of production of Brady leads to prosecutor sanctions)

345. Even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible. No prosecutor was ever reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

346. To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, former DA Hynes stubbornly defended the propriety of his employees' behavior, thereby ratifying and signaling his tolerance of it. Personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions— sometimes within weeks or even days of court decisions identifying the misconduct.

347. High-level KCDA officials have acknowledged in deposition testimony that there was no formal disciplinary procedure or policy for prosecutorial or investigator misconduct committed by KCDA employees, and they were unaware of any prosecutor or investigator ever being disciplined during former DA Hynes's tenure for unconstitutional conduct committed during a criminal investigation or prosecution. In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

348. Former DA Hynes's office likewise had no formal policy requiring disclosure of *Brady* information or any written policy on how to disclose it.

349. Former DA Hynes's office provided no training on how to question or evaluate informant or accomplice witnesses.

350. One high-ranking official testified that, despite having virtually daily contact with former DA Hynes over many years, he never heard former DA Hynes discuss the training of prosecutors in such areas.

351. Even after judgments and settlements were entered against KCDA- affiliated individual capacity defendants in various civil rights lawsuits alleging prosecutorial and investigative misconduct, former DA Hynes's office conducted no investigation and imposed no discipline on any of the employees involved.

352. A number of cases handled by former DA Hynes's office evidence the above policies and practices of encouraging and tolerating misconduct by KCDA staff:

### The Rodney Russ Case

Early in his tenure, former DA Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder conviction obtained in *People v. Russ*, 79 N.Y.2d 173 (N.Y. 1992), a case where the KCDA secured a murder conviction by arresting and threatening a 17 year-old witness with prosecution and imprisonment until she agreed to testify against the defendant. In reversing that conviction, the New York Court of Appeals condemned the "egregious" behavior of the KCDA in "'legally' coerc[ing] testimony." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952) (conduct that "shocks the conscience"). The court wrote that such conduct prejudiced defendants, victimized witnesses, and undermined the integrity of the criminal justice process.

No training or disciplinary action was taken to remedy the misconduct exposed in the *Russ* case.

### The Jabbar Collins Case

Other examples of the KCDA's practice of improperly coercing false testimony and former DA Hynes's endorsement of that practice include the case of Jabbar Collins, where, as in Mr. Mitchell's case, the prosecution's key witnesses were secretly arrested and threatened with imprisonment if they did not testify for the prosecution.

As in Mr. Mitchell's case, the lead prosecutor in Mr. Collins's criminal trial, Michael Vecchione, falsely represented to the jury that his key witness, Edwin Oliva, had no incentive to testify for the prosecution other than to tell the truth. In fact, Mr. Oliva had been pressured to testify by KCDA detective investigators ("DIs") and Mr. Vecchione himself, and offered leniency in his ongoing criminal matters.

Mr. Vecchione suppressed a variety of *Brady* information, including a pre-trial recantation by Mr. Oliva, and, as in Mr. Mitchell's case, the abuse of material witness orders to coerce testimony from two additional witnesses, Angel Santos and Adrian Diaz.

Former DA Hynes vigorously defended the *Collins* conviction, including after the revelation of both the suppression of *Brady* information and the improper coercion of witnesses through material witness orders. Former DA Hynes also approved of the conduct of his prosecutors and investigators in those cases.

Even after two federal judges characterized the conduct of the KCDA in the *Collins* case as "shameful" and a "disgrace," former DA Hynes defended Mr. Vecchione and took no action against him. In fact, despite consistently Vecchione being admonished by courts for improper tactics, on November 28, 2007, Hynes issued a press release announcing that he would be personally presenting Vecchione with the Thomas E. Dewey Medal Award on behalf of the New York City Bar Association, "recognizing [his] excellent work" as "an outstanding prosecutor" in Kings County. Hynes praised Vecchione as "an exceptional prosecutor" who was "truly deserving of this award," and boasted that Vecchione "exemplifies the qualities that serve as an example to all of our prosecutors." Vecchione was subsequently promoted to run the KCDA's Sex Trafficking Unit.

Discovery in Mr. Collins § 1983 lawsuit yielded a host of evidence of the KCDA's unlawful policies, practices, and customs concerning the unlawful detention and coercion of prospective witnesses, including the testimony of former DA Hynes, Mr. Vecchione, former Chief Assistant DA Amy Feinstein, KCDA Homicide Bureau Chief Kenneth Taub, Homicide Bureau paralegal Liz Noonan, and former Supervising DI Stephen Bondor. Those witnesses confirmed that the KCDA's Hotel Custody program was routine for homicide prosecutors in the 1990s.

### The Ruddy Quezada Case

In the Ruddy Quezada case, the KCDA improperly coerced false testimony from Sixto Salcedo. Mr. Salcedo was pressured into naming Mr. Quezada as the perpetrator of the crime, but before trial recanted and refused to testify. Ephraim Shaban, the Assistant District Attorney on the case, submitted an *ex parte* application to the trial court for the issuance of a material witness order for Mr. Salcedo. The purpose of the material witness order, as in Mr. Mitchell's case, was to coerce Mr. Salcedo to revoke his recantation and testify as a prosecution witness.

Mr. Shaban told the trial court that Mr. Salcedo had refused to meet with him and said he would not appear voluntarily. Mr. Shaban then falsely swore that Mr.

Salcedo had failed to comply with a subpoena seeking his attendance. In fact, Mr. Shaban never had a subpoena served on Mr. Salcedo or even issued a subpoena for him.

Contrary to the trial court's order, Mr. Salcedo was never brought before the court to be arraigned on the material witness warrant, appointed counsel, and provided the hearing required under CPL § 620.50. Instead, KCDA detective investigators held Mr. Salcedo extra-judicially. The purpose of the threats and unlawful detention were to extort Mr. Salcedo to change his testimony to support the prosecution's case against Mr. Quezada.

Despite the coercion, Mr. Salcedo told Mr. Shaban that he could not testify because he did not actually see who shot the victim. Mr. Shaban replied that Mr. Salcedo had already given a statement identifying Mr. Quezada as the shooter and testified in the grand jury. Mr. Shaban told Mr. Salcedo that if he went back on his prior statements, he would face prosecution for perjury or obstruction of justice. At the time, Mr. Salcedo was serving a term of supervised release for a federal drug conviction, had an open case being prosecuted by the KCDA (a fact that was never disclosed to the defense at trial), and was not a United States citizen.

Mr. Shaban repeatedly read to Mr. Salcedo the latter's prior recorded statement about the identification of Mr. Quezada. He told Mr. Salcedo that he would face dire consequences if he did not stick to that version. As a result of this pattern of coercion and threats, Mr. Salcedo agreed to repeat his previous accusation that he saw Mr. Quezada shoot the victim.

Mr. Salcedo took the stand at Mr. Quezada's criminal trial and testified as the detectives directed him to. After testifying, Mr. Salcedo was released from custody. In summation, both Mr. Shaban and defense counsel focused their arguments on the issue of witness credibility. Mr. Shaban emphasized to the jury that Salcedo "came forward" to testify. Mr. Shaban told the jury that Mr. Salcedo "was not hesitant," and, at one point in his summation, contended that "[o]nly one person"—Salcedo—"came forward to testify in this case." Mr. Shaban told the jury that once they decided that Mr. Salcedo was credible, they did not even need to consider the three alibi witnesses who testified for the defense.

Mr. Shaban hid the existence of the material witness order through years of post-conviction litigation in Mr. Quezada's case, which was only discovered through discovery ordered by the Eastern District of New York in a *habeas* proceeding.

Mr. Shaban was never disciplined as a result of the Ruddy Quezada case and is currently (or was until recently) a supervisor within the KCDA.

## The Bensale Neptune Case

In a July 7, 1994 decision, in another murder case being prosecuted by the Homicide Bureau under its then-Bureau Chief, former ADA Vecchione, Justice Gerges condemned a homicide ADA for serving a subpoena on a witness on a day there would be no testimony "in the hope that it would coerce the witness into consenting to be interviewed prior to testifying." Justice Gerges denounced the "unprofessional conduct" under numerous prior court decisions outlawing the practice, and admonished the KCDA that the "practice should not be replicated." *People v. Neptune*, 161 Misc. 2d 781, 785; 615 N.Y.S.2d 265, 267 (Sup. Ct. Kings Cty. July 7, 1994) (citations and quotations omitted).

## The Brian Bond Case

Despite Justice Gerges's admonishment, those abusive practices continued. In another murder case, *People v. Brian Bond*, Ind. No. 13991/91, the assigned ADA defied Justice Gerges and the decisions of the Court of Appeals and the Appellate Division upon which his decision had been based. Former ADA Stan Irvin and DIs working under his direction illegally subpoenaed all prospective witnesses to their office to coerce them to submit to office interviews before testifying at trial. Without disclosing to the court the impropriety of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any witness who failed to comply with the subpoenas.

One witness, a crack addict named Carmen Green, had told police detectives and KCDA DIs that she had not seen the incident in question. When DIs found her, they noted that she was too "impaired" to comply with the subpoena. They knew as well that she was under investigation (and feared that she and her children would be arrested) for dealing drugs out of her apartment. Former ADA Irvin obtained a material witness warrant authorizing Ms. Green to be taken "forthwith" to court. Then, without waiting for an attorney to be appointed for Ms. Green, former ADA Irvin had her brought to his office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours. Only after the witness submitted to their custody did the ADA and DIs finally bring her to court, after midnight, so that a judge could sign an order ratifying what was misrepresented as her "consent" to be detained until the conclusion of her testimony.

136. After this litany of unlawful behavior, former ADA Irvin continued to violate *Brady* by not disclosing to the defense Ms. Green's prior statements denying having seen the shooting, her eight-hour unlawful interrogation, her evident drug impairment, the threats made to arrest her and her family, and promises to relocate her at public expense. Nor did he disclose the statements of her other family members that she was not present during the shooting, or that they, too, had been promised, and did receive, relocation assistance. Based on Ms. Green's testimony, Mr. Bond was convicted of murder.

During an evidentiary hearing held in 1998 concerning Mr. Bond's subsequent motion to vacate his conviction due to *Brady* and related constitutional violations, an unapologetic then-ADA Irvin testified that it was the Office's regular practice to pick up witnesses on material witness warrants and, instead of bringing them directly to court "forthwith" as such warrants direct, to forcibly take them for interrogation to the KCDA.

In 2000, the New York Court of Appeals vacated Mr. Bond's conviction due to the Office's failure to disclose Ms. Green's statements denying having seen the homicide. The KCDA Appeals Bureau had argued, on behalf of then-DA Hynes, that it had no obligation to disclose statements that, in its view, were "untrue."

### The Zaher Zahrey Case

In August and September 1994, during the KCDA's investigation of an NYPD detective, Zaher Zahrey, on corruption allegations, detectives working under the supervision of KCDA prosecutors obtained court orders to produce a prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with the prosecutor's approval, interrogated him without notifying his attorney.

In March, 1995, after Mr. Quick had been sent upstate to serve his sentence, detectives, with the prosecutor's approval, again met with Mr. Quick without his attorney, and, through a combination of coercion and promises of expedited release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false. They tape recorded this meeting and gave the tape to the prosecutor, who listened to it, heard the coercion and improper promises, and heard the encouragement of Mr. Quick to adopt a false story. Rather than condemn the detectives' tactics, however, the prosecutor told them that Mr. Quick's statements were "promising."

In or about January 1996, detectives working directly under KCDA prosecutors' supervision arrested several other individuals in the hope of turning them into prosecution witnesses, took them to remote locations instead of to court, and illegally interrogated them in violation of their rights to counsel and prompt arraignment.

Because none of Mr. Quick's false story could be corroborated, which is a prerequisite for prosecution under New York law, KCDA prosecutors obtained former DA Hynes's approval to recommend the case to federal authorities for prosecution. In doing so, however, former DA Hynes's prosecutors did not disclose to the federal authorities the tape, the improper interrogation tactics used with Mr. Quick, or numerous of Mr. Quick's prior inconsistent statements. When Mr. Quick inadvertently disclosed to the federal prosecutor that he had been taped, KCDA employees delayed disclosing the tape for several weeks to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case. Mr. Zahrey

ultimately was acquitted, but not until he had spent nearly nine months in pretrial confinement.

## The Sarni Leka Case

Former DA Hynes likewise ratified his employees' misconduct in the 1990 Sarni Leka prosecution. Shortly after his 1990 conviction, Mr. Leka moved to vacate his conviction because the prosecution intentionally suppressed a variety of *Brady* information. Not only did the KCDA vigorously oppose Mr. Leka's motion and appeal, but former DA Hynes wrote that he had "personally reviewed the facts and circumstances" of the case and "Mr. Leka's due process right as a defendant were amply and ably protected." Years later, however, the U.S. Court of Appeals for the Second Circuit vacated Mr. Leka's conviction, finding that the KCDA had actively "suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous," and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial. *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001). With the only two identification witnesses having recanted their testimony, the KCDA was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison.

No training or disciplinary action was taken to remedy the misconduct exposed in the *Leka* case.

## The John O'Hara Case

John O'Hara, brought an action pursuant to 42 U.S.C. §1983 against the City of New York to recover damages for the politically motivated baseless prosecution by the KCDA under Charles Hynes, which was knowingly supported by fabricated evidence and witnesses who were coerced and bribed to provide false testimony in violation of Mr. O'Hara's constitutional and civil rights. The municipal defendant was denied a motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure in the Eastern District of New York.[246]

## The Carlos Davis Case

The Carlos Davis complaint alleges that the individual City Defendants and others manufactured the false testimony of a material witness, Kristie L. Hayes, the prosecution's key witness at Mr. Davis' trial, whose testimony was fabricated in virtually every respect. Those same defendants suppressed *Brady* information, including Ms. Hayes' true identity, facts contradicting her testimony, the improper methods used to induce her testimony, and documents and other information supporting the defense case. The Complaint further alleges that the suppression of *Brady* information, fabrication of evidence, and subornation of perjury were caused

---

[246] See O'Hara v. City of New York, 2019 U.S. Dist. LEXIS 91551 **25-27 (E.D.N.Y. 2019).

by express or *de facto* policies, customs, and practices of the City of New York – specifically, the Kings County District Attorney's Office ("KCDA").[247]

353.   Criminal and civil cases demonstrating the unconstitutional patterns, policies, customs, and usages of the KCDA may be further inferred from numerous cases in which the KCDA violated its *Brady* obligations and the KCDA turned a blind eye to witness dishonesty, as demonstrated in the following cases:

(a) *People v. Cortez*, 149 Misc.2d 886 (Sup. Ct. Kings Co. 1990) (police violated "spirit" of *Brady* by intentionally destroying a tape they were ordered by the court to preserve and finding that the DA's Office shared responsibility and the indictment was dismissed);

(b) *People v. Moss*, 176 A.D.2d 826 (2d Dept. 1991) (conviction reversed for police officer's loss and/or destruction of contemporaneous description of the defendant);

(c) *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992) (police failed to disclose buy report with description of suspect that was inconsistent with officer's testimony and new trial ordered for *Brady* violation);

(d) *People v. Nikollaj*, 155 Misc.2d 642 (Sup. Ct. Bronx County 1992) (new trial ordered for *Rosario* violations where police failed to turn over numerous inconsistent statements of complainant officers);

(e) *People v. Dunn*, 185 A.D.2d 54 (1st Dept. 1993) (conviction reversed in part where, among other things, police detective destroyed interview notes);

(f) *People v. Morrow*, 204 A.D.2d 356 (2d Dept. 1994) (conviction reversed where a significant portion of police report was not disclosed);

(g) *People v. White*, 200 A.D.2d 351 (Pt Dept. 1994) (conviction reversed where DD-5 containing *Brady* and *Rosario* material was not disclosed, and only was discovered through defendant's post-conviction FOIL request to the NYPD and Bronx DA's Office);

(h) *People v. Anderson*, 222 A.D.2d 442 (2d Dept. 1995) (conviction reversed where scratch notes lost or destroyed due to officer's "lack of due care");

(i) *People v. Brogdon*, 213 A.D.2d 418 (2d Dept. 1995) (conviction reversed where notes made by NYPD sergeant were withheld from defendant, and where identification by

[247] Davis v. City of New York, 2017 U.S. Dist. LEXIS 143678 **12, 13, 24-28 (E.D.N.Y. 2017).

undercover "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive."

(j) *People v. Joseph*, 86 N.Y.2d 565 (1995) (adverse inference instruction appropriate where police deliberately destroyed interview notes);

(k) *People v. White*, 232 A.D.2d 436 (2d Dept. 1996) (conviction reversed due to loss of police officer's memo book through lack of due care, where there was a serious identification issue, and defendant was prejudiced by his inability to cross-examine officer using missing memo book);

(l) *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997) (conviction reversed for failure to disclose notes of police interview with a key witness; officer's typewritten notes were not duplicative equivalent because they contained "variations");

(m) *People v. Jackson*, 237 A.D.2d 179 (1st Dept. 1997) (conviction reversed for *Brady* violation consisting of the withholding by the police of internal affairs reports that contained entries that were significantly at variance with prosecution's evidence at trial and were favorable to defendant);

(n) *People v. Branch*, 175 Misc.2d 933 (Sup. Ct. Kings County 1998) (People successfully fought motion to vacate judgment based upon confession of real killer; conviction overturned in 2002 after key prosecution witness recanted and said police paid him for his cooperation);

(o) *Hart v. City of New York*, 186 A.D.2d 398 (1st Dept. 1992): (damage award upheld against police officers who gave false grand jury and trial testimony);

(p) *Gurley v. City of New York, et al.*, 95-cv-2422 (E.D.N.Y., settled 8/21/97, $1,7500,000) (conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report; complaint alleged that NYPD had longstanding policy of deliberate indifference to the constitutional requirement that exculpatory evidence be preserved and disclosed to defendants);

(q) *Napoli v. City of New York, et al.*, 97-cv-1255 (E.D.N.Y., settled 4/9/99, $60,000) (plaintiff arrested on weapons possession and assault charges based on false testimony by NYPD officers in grand jury; complaint alleged *Monell* theory of liability based on City's deliberate indifference to constitutional obligations of the NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights);

(r) *Gordon v. City of New York, et al.*, 97-cv-8035 (S.D.N.Y., settled 11/12/98, $40,000) (plaintiff arrested without probable cause based on false allegations in

felony complaint made by NYPD officers; charges dismissed by prosecutor three months after arrest);

(s) *Jefferson v. City of New York, et al.*, 98-cv-1097 (E.D.N.Y., settled 4/14/99, $175,000) (plaintiff corrections officer arrested on drug charges without probable cause; charges pending for five months before grand jury returned no true bill; complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution);

(t) *Sweazie v. City of New York, et al.*, 99-cv-419 (E.D.N.Y., settled 10/20/99, $20,000) (plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint; charges dismissed when grand jury voted no true bill);

(u) *Lovell v. City of New York*, et al., 00-cv-0002 (S.D.N.Y., settled 10/20/00, $40,000) (plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint; complaint alleged *Monell* theory of liability based on the City's deliberate indifference to constitutional obligations of the NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to IAB and CCRB); and

(v) *Crespo v. City of New York, et al.*, 93-cv-8847 (S.D.N.Y., settled 8/29/06, $25,000) (plaintiff arrested without probable cause on weapons possession charges; complaint alleged *Monell* claim based on NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals").

## FIRST CAUSE OF ACTION

42 U.S.C.§1983 <u>Monell</u> Claim

Against the City of New York for the

Actions of the KCDA

354. The policies, customs, and practices of the KCDA discussed above, as engaged by the KCDA under Charles Hynes and his successors, infected the People's case against the Plaintiff for Kings County Supreme Court Indictment 4743-2010.

355. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-354 as though fully set forth herein.

356. KCDA prosecutors deliberately presented known false and misleading evidence before the grand jury in order to obtain the indictment.

357. For example, KCDA prosecutors knowingly presented and made use of a fraudulent material affidavit, purportedly signed by Minnie Simmons, to the grand jury. KCDA prosecutors made use of a fraudulent CPL §190.30 affidavit they knew Minnie Simmons did not sign. When Minnie Simmons testified that she did not sign the CPL §190.30 affidavit the KCDA prosecutors did not seek to correct her testimony or renew their presentation to the grand jury.[248]

358. There also is evidence that Minnie Simmons lacked the mental acuity to sign the CPL §190.30 affidavit at the time she purportedly did. KCDA prosecutors and investigators deliberately suppressed reports by family members of Minnie Simmons dementia for several years during the pre-indictment and pre-trial proceedings to ensure the viability of the CPL §190.30 affidavit could not be challenged in court.[249]

359. The KCDA policy, custom, and practice of suppressing material exculpatory information the prosecutors and their investigators were aware of infected Kings County Supreme Court Indictment 4743-2010.

360. The KCDA prosecutors suppressed Charles Emma's knowledge, gleaned from family members at the onset of his involvement with the case, of reports of Minnie Simmons suffering from dementia from approximately April 2009 through to June 2013.

361. KCDA prosecutors and investigators kept this exculpatory information (Brady material) away from the defense throughout all pre-indictment and pre-trial

---

[248] See Exhibit 19 the 5/18/11 Conditional Examination at 33.
[249] Trial Record at 144, 166-167, 279-280, 285, 312.

proceedings despite frequent requests by the defense and court orders for the production of this information.[250]

362. KCDA prosecutors falsely asserted in multiple affirmations to the trial and appellate courts that they were unaware of any reports of Minnie Simmons dementia. The KCDA maintained these known false affirmations, without correction, from 2010 through Charles Emma's June 2013 testimony, and throughout the post-conviction and appellate process.

363. The KCDA prosecutors knowingly put forth multiple false affirmations in support of their efforts to suppress the revelation of the reports of Minnie Simmons dementia in order to prevent the defendant's use of this information to impeach a primary prosecution witness.

364. The KCDA also engaged in the suppression of reports of Minnie Simmons dementia in order to deny the defense access to memories she may have had that were favorable to the accused.

365. KCDA prosecutors deliberately allowed Minnie Simmons memories of transactions pertinent to the estate to diminish with time so that the accused could not resource them as a part of his defense.

366. Instead KCDA prosecutors deliberately, falsely, and repeatedly suppressed reports of Minnie Simmons dementia so the defense could not impeach her testimony and/or try to interview her and preserve testimony that may have been favorable to the defense. This was done as a deliberate strategy to disadvantage the defense to the indictment.

---

[250] See Exhibit 12; compare Trial Record at 144, 166-167, 279-280, 312 with Exhibit 10.

367. The aforesaid mendacious, illegal, and unethical tactics with regard to the Plaintiff are consistent with the policies, customs, and practices exemplified by the cases listed and discussed above that do not involve the Plaintiff.

368. Perhaps the worst offense perpetrated by the KCDA prosecutors was their encouragement and use of known false material testimony by a prominent witness, former Kings County Supreme Court Justice Michael Pesce.

369. The People called Justice Pesce as a witness because they doubted Minnie Simmons could serve as a credible witness. Justice Pesce was called in her stead to serve as a permission and authority witness; a witness who had lawful authority to determine the disposition of the assets of the estate.

370. Justice Pesce knowingly testified falsely and stated that he had lawful authority to determine the disposition of the estate's assets when he knew, in fact, he did not. The trial court denied the accused the opportunity to cross-examine, and thereby impeach, Justice Pesce on the issue of his authority.[251]

371. The trial court also refused to charge the jurors the extent of Justice Pesce's lawful authority significantly damaging a key and material component of the defense.

372. KCDA prosecutors endorsed and maintained Justice Pesce's false material testimony throughout the trial and summations without correction.

373. KCDA prosecutors also endorsed and maintained Justice Pesce's false material testimony and other known false material affirmations throughout the post-trial and appellate proceedings. The KCDA never has corrected false material

---

[251] Compare Exhibit 4: In the Matter of Brown, No. 107103-99 at 2 (Supreme Court, Kings County, February 24, 2010) with Trial Record at 611, 658, 900, 1115-1116.

assertions, affidavits, or testimony as a part of the post-conviction or appellate proceedings for this case.

374. The People's use of Justice Pesce's false testimony and their refusal to correct it, consistent with the obligations of <u>Napue</u> continues to this day.

375. Plaintiff repeats and realleges the allegations set forth in paragraphs 354-373 as though fully set forth herein.

376. District Attorney Hynes, and his successors, when acting as the manager of the Kings County District Attorney's Office, acted as New York City policymakers.

377. Therefore, the City of New York is liable for District Attorney Hynes's, and his successors, conduct insofar as they acted as a New York City policymaker, which resulted in the violation of Stephen T. Mitchell's constitutional rights.

378. Additionally, the KCDA, through District Attorney Hynes, and his successors, maintained unlawful policies, practices, and customs by conducting illegal and unethical acts, including fabricating evidence, providing the courts with known false affirmations in support of or in opposition to motions, encouraging and tolerating material witnesses to testify falsely, and suppressing exculpatory evidence.

379. District Attorney Hynes, and his successors, as the managers of the KCDA, knew of the unlawful policies, practices, and customs yet failed to supervise or discipline their Assistant District Attorneys and Investigators who committed unlawful and improper acts pursuant to the policies, practices, and customs and remained deliberately indifferent thereto.

380. As a result of the unlawful policies, practices, and customs, Stephen T. Mitchell's constitutional rights were violated and he suffered damages.

381. Therefore, the City of New York is liable for the KCDA's unlawful policies, practices, and customs which the City municipal defendants acted pursuant to, which resulted in the violation of Stephen T. Mitchell's constitutional rights.

382. For all the aforesaid reasons the City of New York has violated the federal constitutional rights of the Plaintiff pursuant to 42 U.S.C. §1983 and Monell.

## SECOND CAUSE OF ACTION
42 U.S.C.§1983 Monell Claim with an
Equal Protection Claim
Against the City of New York for the
Actions of the KCDA

383. Plaintiff, an African-American male, repeats and realleges the allegations set forth in paragraphs 1-380 as though fully set forth herein.

384. District Attorney Hynes, and his successors, when acting as the manager of the Kings County District Attorney's Office, acted as New York City policymakers.

385. Therefore, the City of New York is liable for District Attorney Hynes's, and his successors, conduct insofar as they acted as a New York City policymaker, which resulted in the violation of Stephen T. Mitchell's constitutional right to Equal Protection of the Laws in accord with the Fourteenth Amendment to the United States Constitution.

386. Additionally, the KCDA, through District Attorney Hynes, and his successors, maintained racially discriminatory policies, practices, and customs, as described above, of conducting illegal and unethical acts, including fabricating

evidence, providing the courts with known false affirmations in support of or in opposition to motions, encouraging and tolerating material witnesses to testify falsely, and suppressing exculpatory evidence.

387. The aforesaid policies, practices, and customs overwhelmingly and disproportionally were practiced against African-American males such as the Plaintiff because of their race and color. The Plaintiff was impacted by these racially discriminatory policies, customs, and practices.

388. District Attorney Hynes, and his successors, the managers of the KCDA, knew of the racially discriminatory impact of the aforesaid policies, practices, and customs yet failed to supervise or discipline their Assistant District Attorneys and Investigators who committed racially discriminatory acts pursuant to the policies, practices, and customs and remained deliberately indifferent thereto.

389. As a result of the racially discriminatory policies, practices, and customs, Stephen T. Mitchell's constitutional rights in accord with the Equal Protection Clause of the Fourteenth Amendment were violated and he suffered damages.

390. Therefore, the City of New York is liable for the KCDA's racially discriminatory policies, practices, and customs which the City municipal defendant acted pursuant to, which resulted in the violation of Stephen T. Mitchell's constitutional rights pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

391. For all the aforesaid reasons the City of New York has violated the federal constitutional rights of the Plaintiff pursuant to 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF PURSUANT TO 42 U.S.C. §1983

WHEREFORE, Plaintiff STEPHEN T. MITCHELL demands judgment against the above-captioned Defendant as follows:

1. For compensatory damages to be determined at trial;
2. For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. §§ 1983 and 1988 and other applicable laws;
3. For pre-and post-judgment interest as allowed by law; and
4. For such other and further relief Plaintiff is entitled and that this Court deems just and proper.

## VERIFICATION

I affirm under the penalties of perjury pursuant to 28 U.S.C. §1746 that the aforesaid statements are true and correct to the best of my ability.

Dated: September 5, 2023

Stephen T. Mitchell

By: _____

Stephen T. Mitchell, Esq.
New York, NY 10025
STM7615@aol.com

DEFendANT City of New York
ADDress:
Special Federal Litigation
Division
New York City Law Dept.
100 Church Street
New York, NY 10007

83